United States Court of Appeals
Fifth Circuit

**F I L E D**

March 16, 2006

Charles R. Fulbruge III
Clerk

REVISED APRIL 12, 2006

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

Nº 04-60832
Summary Calendar

_____

MONIQUE T. MWEMBIE,

Petitioner,

VERSUS

ALBERTO GONZALES,
UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of
the Board of Immigration Appeals

_____

Before SMITH, GARZA,[*] and PRADO,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

_____

[*] Judge Garza concurs except for part II.

Monique Mwembie petitions for review of the denial by the Board of Immigration Appeals ("BIA") of her application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We deny the petition.

## I.

Mwembie, a citizen of the Democratic Republic of Congo ("DRC"), fled that country in 2001 after the assassination of the former president, Laurent Kabila.[1] Mwembie worked as a secretary in the communications department at the Marble Palace, R. 461, 467, where Kabila held various meetings.[2] Mwembie's job involved editing and/ or creating press releases regarding the meetings, based on reports she received from others. R. 186-187.

Her job went well until January 16, 2001, when she heard gunshots, during which everyone panicked. R. 461, 467. Soldiers and other people were running everywhere. R. 461, 467. At first, Mwembie and others in her office hid under their desks; she was shaking. R. 177. The gunshots lasted about thirty minutes. R. 177.

After that, Mwembie went outside her room and saw everyone running around. R. 178. Other colleagues in the hallway also asked what was going on. R. 461, 467. She did not really know what to do, so she picked up the phone, but there was no dial tone. R. 178.

Around 1:30 p.m. the military ordered that each person return to his work station, explaine that the Marble Palace was under siege, and said no one was to leave the palace. R. 461, 467. Mwembie did not know whether it was the police or the military that told them not to leave the palace and that they had been taken "hostage."[3] R. 179-80. Because of the large number of soldiers present, she thought they consisted of not only the military guard of the president working at the palace, but also some other soldiers from the outside. R. 149.

Mwembie remained at her desk till 10:00 p.m., when the military put everyone into a

---

[1] The opinion of the immigration judge ("IJ") incorrectly calls the former president "Lavent Cabila."

[2] The IJ's opinion states that the Marble Palace was the "governmental palace" and that "all of the government's business was conducted out of the governmental palace." This finding has no support in the record. Mwembie testified that the Marble Palace was used for meetings; she never said it was used to conduct "all" government activity. R. 141, 143.

Mwembie also testified that apparently around 100 to 200 civilians were arrested at the palace and that all civilians there were arrested. R. 181. If indeed the palace were the seat of the DRC "government," including all the ministries (*e.g*, finance, tourism, education, health, interior), from which "all" government business was conducted, it would have provided office space for more than 100 to 200 civil servants.

[3] During cross-examination, the Department of Homeland Security insisted that Mwembie and the others were not taken "hostage" but were only "detained for questioning," because the police do not take hostages. R. 79-80. The assumption that the police in a country with confirmed human rights abuses never take anyone "hostage" reflects not only a lack of familiarity with foreign country conditions, but also insensitivity to misunderstandings resulting from the use of translators. *Iao v. Gonzales*, 400 F.3d 530, 533-34 (7th Cir. 2005) (describing these two problems and a few others as "disturbing features" present in a large number of cases reviewed by the Seventh Circuit). If Mwembie used a word in the Lingala language akin to the word "sequester" to describe the fact she was not allowed to leave the building, a closer translation is probably "taken hostage" rather than "detained."

jeep,[4] R. 147, where they were ordered to lie down and close their eyes, R. 468. Someone asked where they were being taken and why, and in response the soldiers beat the person with a baton, causing his nose and mouth to bleed; the soldiers then explained that everyone had to be quiet and did not have the right to ask questions. R. 468, 148.

Mwembie and the others were taken to a big room, where they were kept for two days. R. 150. She explained that everyone working at the palace (approximately 100 or more people) were taken to that room. R. 181. On the third day, the women were separated from the men, and all the women that worked in Mwembie's department were taken to one prison. R. 150.

There, Mwembie and five other women from her department were taken to a cell, R. 150, which she described as one-third the size of the courtroom. R. 181. They were shown a rug on which they were to sleep and five or so soldiers that were supposed to watch over them. R. 150. Mwembie did not know how many women were in the prison and could not estimate how many had been arrested on January 16. R. 181. They were fed a single piece of bread and tea mixed with milk once a day and were allowed to use an outdoor restroom once a day. R. 153. They received no medical treatment. R. 159.

Each woman was taken daily to be interrogated. R. 151, 161-62. During her questioning, Mwembie was told she had been arrested because she was working at the palace on the day Kabila was killed. R. 161. There were three judges who interrogated them. R. 161. The interrogators told her they had talked to her friends, who had said she had given information to outsiders about when Kabila was in the palace and that she had enabled the outsiders to enter the palace. R. 152. Mwembie told them she had no involvement in Kabila's death or knowledge of who had killed him. R. 469, 153. The women were instructed not to talk to each other about the interrogations. R. 153.

The guards in charge of Mwembie's cell beat and raped each of the women in the cell on a daily basis, each taking a turn while the others held the woman down, or watched. R. 155, 157-158, 160. Mwembie was one month pregnant at the time of her detention. R. 160. On one occasion when she was raped, she suffered a miscarriage, causing her to lose blood and then consciousness. R. 157, 159. She was traumatized over this experience. R. 159. The guards, however, took no mercy on her and continued to rape her even after the loss of her child. R. 160.

One day, during an interrogation, Judge Gigal asked Mwembie about her parents and told her he knew her parents, sister, and aunt and that because he knew her family, he would help her. R. 161-163. He asked for the help of Chief Judge Mukumbi,[5] who was his uncle,

---

[4] In her opinion, the IJ also snaps at the use of the word "hostage." R. 69. She incorrectly states, however, that Mwembie testified that she was taken hostage at about 10:00 p.m., when in fact Mwembie testified that she was held hostage from 1:30 p.m to 10:00 p.m. R. 147, 467.

[5] The IJ's opinion incorrectly calls Judge Mukumbi three different names in the same paragraph: Mokumbe, Mukumbe, and Makumbe, R. 70, and refers to him incorrectly as Mukumbe thereafter. The correct name is Mukumbi, as shown in Mwembie's testimony, R. 163, and the asylum
(continued...)

to organize Mwembie's escape from prison. R. 164.

Two days after the judges promised to help her, soldiers came for her in the middle of the night and took her out of her cell; it was well known that when soldiers take someone in the middle of the night, that person will be killed. R. 164. They did not kill her, however, but put her into Mukumbi's car trunk, whereupon he drove away with her in the trunk. R. 164.

After thirty minutes, he stopped and made her change her clothes, R. 164, then she rode inside the car to the border at Kinsuka, R. 164-165. There, Mukumbi told her that it would be made to appear on paper that she had been killed in prison, so she was never to return to the DRC, R. 164, 173, 184, or to communicate with anyone, R. 473. Gigal, who knew her family, indicated he would explain to her parents that she had actually escaped the country. R. 172-173.

Mwembie then crossed the river and met a person who was waiting there with a car. R. 165. She hid inside that person's home in Brazzaville for two weeks until he obtained a passport for her to leave the country. R. 165. Mwembie and this person flew from Brazzaville to Ethiopia, then to Italy, and finally, to New York. R. 165-166.

During the immigration inspection at the airport in New York on March 17, 2001, Mwembie's companion presented the fraudulent Belgian passport he had obtained for her, and spoke on her behalf, because she did not understand English.[6] R. 166. After their admission into the United States, they took a bus to Raleigh, North Carolina, R. 166, where her companion left her to return to the Congo, R. 166.

Mwembie then contacted the only person she knew in the United States, Laurent Matalatala,[7] who resided in San Antonio, Texas. R. 166. Though Mwembie had never met Matalatala, she knew of him through a friend, and they had exchanged letters and had spoken on the telephone. R. 169-170. After contacting Matalatala, Mwembie took a bus to San Antonio, where he picked her up. R. 167. After hearing her story, Matalatala advised her to apply for asylum and assisted her in filing her application on September 14, 2001. R. 167, 176, 482.

II.

The IJ denied Mwembie's claims, and the BIA affirmed without opinion. Therefore, the proper focus of our review is the underlying decision of the IJ. *Garcia-Melendez v. Ashcroft*, 351 F.3d 657, 660 (5th Cir. 2003). The IJ devoted most of her opinion to credibility determinations and found that Mwembie is ineligible for asylum and withholding of removal and protection under CAT.

------

[6] The IJ inaccurately states that Mwembie entered the United States based on a fraudulent passport and visa from Belgium. Holders of Belgian passports do not need a "visa" to enter this country, because they receive a visa-waiver. Thus, Mwembie did not enter based on a fraudulent "visa," but on a "visa waiver" obtained under the false pretense that she was a Belgian citizen.

[7] There are various spelling of Matalatala's name in the record. We use the name used in Mwembie's original asylum application of September 14, 2001, which Matalatala helped prepare.

------

[5](...continued)
application. R. 472.

4

We review this factual basis for substantial evidence. *Zhang v. Gonzales*, 432 F.3d 339, 343-44 (5th Cir. 2005). Under that standard, we will not disturb the IJ's findings of fact "unless we find not only that the evidence supports a contrary conclusion, but that the evidence compels it." *Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994). The alien bears the burden of proving that "the evidence was so compelling that no reasonable factfinder could conclude against it." *Id.*

For asylum, withholding of removal, and CAT claims, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."[8] We cannot second-guess the BIA or IJ by substituting our credibility judgment for that of the factfinder. *Chun*, 40 F.3d at 78.

Even given this highly deferential standard, however, the IJ's conclusion that Mwembie did not meet her burden of persuasion on the likelihood of future persecution if returned to DRC is not supported by substantial evidence. Although we ultimately sustain the IJ's decision by denying the petition for review, it is not because Mwembie has not met her burden of proof that she will be persecuted, but because she has not satisfied her burden to show that she will be persecuted "on account" of one the five enumerated reasons.[9] We address, none

theless, the credibility issue because of the poor quality of the IJ's work and because the parties devote the bulk of their briefs to this question.

Although "[w]e will not review decisions turning purely on the [IJ's] assessment of the alien petitioner's credibility," *Chun*, 40 F.3d at 78 (quoting *Mantell v. INS*, 798 F.2d 124, 127 (5th Cir. 1986), we have not read this to mean that credibility determinations that are unsupported by the record and are based on pure speculation or conjecture will be upheld. Rather, our caselaw interprets this as meaning that where the judge's credibility determinations are supported by the record, we will affirm them even if we may have reached a different conclusion, because we will reverse only if the record "compels" a different conclusion.[10] In fact, this is the standard the De

---

[9](...continued)
an alien must show "a subjective fear of persecution, and that fear must be objectively reasonable." *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001).

A claim for withholding of removal, meanwhile, does not require proof of subjective fear, *Zhang*, 432 F.3d at 344, but it does require that the alien prove a "clear probability" of future persecution, *IRS v. Stevic*, 467 U.S. 407, 413 (1984): Mwembie must show it is more likely than not that "[her] life or freedom would be threatened . . . because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

---

[8] 8 C.F.R. §§ 208.13(a) (asylum); 208.16(b) (withholding of removal); 208.16(c)(2) (CAT).

[9] To be eligible for asylum, an alien must be "unable or unwilling to return to . . . [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To demonstrate a well-founded fear of persecution,
(continued...)

[10] *See, e.g., Lopez de Jesus v. INS*, 312 F.3d 155, 161 (5th Cir. 2002) ("[A] credibility determination may not be overturned unless the record compels it."); *see also Kurji v. Gonzales*, 140 Fed. Appx. 549, 550 (5th Cir. 2005) (per curiam) ("[T]he record does not compel a credibility deter-
(continued...)

partment of Justice cites in its brief, though it mistakenly labels Third Circuit precedent as coming from this court:

> Further, although adverse credibility determinations cannot be based on speculation or conjecture, such findings will be afforded substantial deference where it [*sic*] is grounded in evidence in the record and where the [IJ] provides specific cogent reasons for her determination. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 597 (5th [*sic*] Cir. 2003).

Many of the key findings by the IJ are not supported by the record and are based on pure speculation or conjecture. For example, the IJ found it implausible that Mwembie fled her country without saying goodbye to her family. To reach this finding, however, the IJ should have had more information.

There is nothing in the record to suggest that aliens fleeing from prison to a different country usually go home to say good-bye. In fact, the BIA has rejected such a speculation and has found that it is not unreasonable for an asylum applicant to flee his country, leaving family behind, where returning to his or her family members would put his life in danger. *In Re B-*, 21 I&N Dec. 66 (BIA 1995).

Mwembie did not have control of where Mukumbi was driving while she was in the trunk of his car. Further, Mwembie escaped to a different country during the night of her escape: She fled from the DRC to

---

[10](...continued)
mination contrary to that of the IJ."); *In re A-S-*, 21 I&N Dec. 1106 (BIA 1998) (explaining that the BIA generally defers to and adopts the IJ's credibility determination if supported by the record).

Congo Brazzaville. During her short two-week stay in Brazzaville, she was not allowed to leave the house. So, there is nothing in the record that would contradict her testimony that she did not and could not say good-bye to her family; in fact, the record compels the opposite conclusion.

The IJ also found that Mwembie's testimony was vague because she gave few details of her life in prison "other than consistently stating that she was raped daily and interrogated." To the contrary, Mwembie described prison life in detail. She explained what type of food she received, how often, how many times she was allowed to use a restroom, how many cellmates she had, and how big her cell was. She gave the number and names of the judges and the number of soldiers guarding her cell and described in detail the episode leading to her miscarriage.

In discrediting Mwembie's testimony as vague, the IJ pointed out that Mwembie did not state the date on which she was released from prison. The record compels a different conclusion, however. Mwembie testified that she fled to Congo Brazzaville on the night of her escape. She also wrote in her asylum application that she fled her native county on March 1, 2001. R. 475. Accordingly, in light of the fact that she escaped from prison on the day she fled to Brazzaville, she must have escaped on March 1 as well. This date is consistent with her account that she spent six weeks in prison (having been imprisoned on January 16, 2001), that she spend about two weeks in Brazzaville, and that she arrived in the United States on March 17.

The IJ also found that Mwembie's testimony that she was raped daily is implausible because "the brutality that [she] has described

is simply not comprehensible." R. 77. This is error.

That brutality is extraordinary does not render it implausible. Under the IJ's logic, Jews fleeing Nazi Germany and describing the concentration camp atrocities would have been denied asylum because the brutality they described would be "incomprehensible."

Absent more information about Congolese guards watching prisoners for the military tribunals, the record does not support a conclusion that the brutality was incomprehensible. In fact, the record shows that several defendants in the Kabila trial were tortured in prison. R.431. The record also does not contain information that would challenge the claim that the soldiers were brutal. To the contrary, the record shows that the Congolese guards apparently told Mwembie that she deserved to be raped and die because she was a criminal. R. 470-471. This justification for brutality is far from incomprehensible.

Thus, given the justification the guards offered for their brutality, there is no reason to think they aspired to be "comprehensible" persecutors who rape less than daily. Also, because the record indicates that Mwembie was not allowed to have a lawyer or to see her family, there was no apparent external pressure that would keep the soldiers in check.

The IJ also found it implausible that five guards were guarding six female prisoners. That finding would be defensible if indeed there were any evidence that the guards were guarding only the six female prisoners in Mwembie's cell. There is, however, no evidence that her cell was the only one in the prison or that the guards did not guard any other cells. Although Mwembie could not say how many women were in the prison, she never testified that there were no other women there. She merely had no information with respect to that. The IJ's finding is not supported by substantial evidence in the record, which compels a contrary conclusion.

The IJ also found it implausible that two judges helped Mwembie escape when it was in their power to release her. But, there is no indication in the record that the "decision to release her was in their hands." There is no hint that any suspect was released before trial, and the verdict was rendered almost two years after January 16, 2001. R. 287. Indeed, the fact that as many as fifty people were found not guilty suggests that no one was released prior to trial. R.287.

Therefore, if indeed one of the judges was a friend of Mwembie's parents, it is plausible that he would have helped her get out of prison before trial, given that prison meant daily rape and a slice of bread per day for several more months. Further, we have no information on whether the interrogating judges would have been the same judges presiding at trial. If they were not the same, they presumably could not have helped release her.[11]

The IJ also found it implausible that the judges would make it appear on paper that Mwembie had been killed, but on the other hand telling her family she had escaped. Again, this is not a rational reason for which *any* "reasonable factfinder" could ever find a

---

[11] Although the Department of Justice points out that it "strains credulity" that a judge would risk his career for Mwembie, here the risk of saving the innocent daughter of a friend or neighbor from daily rape and possible death may have been deemed worth taking.

testimony implausible. There is absolutely no inconsistency between the two actions: The judges, who are friends of Mwembie's family, wanted the DRC government to think she was dead so it would not harass her family after her escape, and the judges also wanted her family to know she in fact was safe. There is nothing in the record to suggest otherwise.

The IJ also found implausible Mwembie's account of being detained for more than two days, because the IJ thought that the record shows that the only women who were detained were married to other suspects. This statement misreads the record.

The newspaper articles and reports state that "at least three women were arrested and tried for and on behalf of their husbands, R. 287; "the suspects included 10 civilians, among which five women," R. 292; "a number of the female defendants may be . . . detained simply because they were related or married to suspects still at large," R. 302; and "Kabila's former guards and aides, as well as the wives and girlfriends of suspects are charged with a role in the assassination, R. 434. Therefore, the fact that "at least three women" were arrested on behalf of their husbands does not indicate that only those women, or only those types of women, were arrested; more information is needed to draw that inference.

Similarly, the record shows that "a number of female" defendants were arrested on behalf of their husbands, not that "all" women were. Also, the record indicates that not only the wives of suspects, but also a number of Kabila's "guards and aides" were arrested: As an employee at the Marble Palace, Mwembie can be considered to have been a presidential aide. Therefore, there is nothing in the record that supports the IJ's finding, and the record com-

pels a different conclusion.

The IJ took issue with Mwembie's testimony that she memorized and remembered Matalatala's phone number; the IJ thought that no one who suffered daily rape for six weeks could remember a phone number. To make that decision, however, the IJ would need to know several facts not in the record: How often did Mwembie call Matalatala before her imprisonment; how good was Mwembie's memory generally; and how is long-term memory affected by six weeks of prison and rape? Though Mwembie indicated she lost consciousness after one of the rapes, there is no indication that the rapes affected anything other than her short-term memory.

In fact, it is quite plausible that Mwembie remembered Matalatala's phone number, because she testified that she did not call him from her mobile phone but from a phone booth, where the cost was one dollar a minute. Because she had to dial the full number every time, it is more likely that she would have memorized it.

Therefore, the IJ's reasoning why Mwembie could not have remembered the phone number is not only not supported by the record, but also not "rational." Although we agree with the premise of *Dia v. Ashcroft*, 353 F.3d 228, 362 (3d Cir. 2003) (en banc) (Alito, J., dissenting), that an IJ can base some of his determinations on his understanding of general human behavior, such understanding must be "rational." Here, the IJ's finding is not rational, and the record compels a different result. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481-84 (1992).

What is most troubling about the IJ's opinion, is not, however, her incorrect and irratio-

8

nal assumptions about human behavior and especially the behavior of people from foreign cultures, such as her assumptions about a victim's ability to remember phone numbers, about all aliens' behavior in saying good-bye to their families before fleeing, or about the "incomprehensible" brutality of the persecutors. It is rather the IJ's lack of familiarity with the record and her inability to comprehend it, as demonstrated by her misspelling of the president's name, her three different misspellings of Mukumbi in the same paragraph, and her fabrication of facts not in the record (such as her statements that "all" of the government's business was conducted out of the Marble Palace and that only women married or related to male suspects were detained in the Kabila investigation).

There are other serious flaws in the IJ's analysis. For example, in her asylum application Mwembie indicated that it was one of the soldiers who took her to a judge to be interrogated, who asked her who her parents were and told her he knew her family because they were neighbors in Lubumbushi, Katanga. R. 471-472. Mwembie then explained that two days later that soldier, who is now called the "Commander," took her to the judge and said she was the daughter of Mwembie and that Mukumbi told the Commander he would help her. R. 472. Then, a few days later, Mwembie escaped in the trunk of Mukumbie's car with the help of Mukumbie and the Commander, now called "Commander Mukumbi." R. 472.

Mwembie testified, however, that it was Gigal, at interrogation, not one of the soldiers, who asked who her parents are. He knew her parents, too, but from Russia, not from Lubumbashi. Also, it was Mukumbi, not Commander Mukumbi, who helped her escape. These inconsistences deserved further probing.

Also, an item of identification that Mwembie submitted with her application indicates, albeit in French, that during 2000-2001, she was a first-year student in molecular biology at the University of Medicine. R. 483. She did not mention this fact; rather, her application seems to indicate she never attended post-secondary education other than a computer course. R. 454. According to the educational history she provided in her asylum application, Mwembie only attended high school and a computer course and graduated from the computer course in 1997. R. 454. Also according to the record, Mwembie was a mother of three, and had her first two children when she was 15 in 1988 and her third child when she was 22. Thus, apparently she was able work as a communications secretary, be a university student in a challenging subject such as molecular biology, and be the mother of three, all at the same time, during 2000-01. Though this could be plausible if, for instance, she attended classes at night, the IJ should have explored this issue.

### III.

Despite these enormous shortcomings in the IJ's performance, we sustain her decision by denying the petition for review because she also found that Mwembie was not persecuted on "account of any of the five reasons enumerated under the Act." Although the IJ did not further elaborate, this was the correct way to dispose of the claims, which both require that Mwembie have been persecuted on account of "race, religion, nationality, membership in a particular social group, or political opinion."

In her various filings, Mwembie asserted that she was persecuted because of her "imputed political opinion" and her "membership in a social group." The IJ, however, found that she was detained because of "legitimate

9

investigation" into the assassination, R. 79, and this finding is supported by substantial evidence.

In other words, even if Mwembie's account is believable, she claims, in her asylum application and testimony, that she was imprisoned because she was in the building at the time of the assassination. Even if the investigators believed she was involved in a political conspiracy to overturn the Kabila regime, they were investigating her solely because she was a criminal suspect in a murder, not because she was against the Kabila regime. Therefore, she was ineligible for asylum or withholding of removal.[12]

Mwembie also claims she was persecuted on account of membership in a particular social group, "government employees." R. 25. Even if "government employees" were found to be a cognizable social group, there is no evidence supporting the claim that all DRC government employees were targeted or persecuted. To the contrary, it appears that only about one hundred government employees at the Marble Palace, not all government employees in general, were singled out for "persecution."

Even if the group were defined to be "all government employees at the Marble Palace," this would not meet the definition of "social group." To establish that he is a member of a "particular social group," an applicant must show that he was a member of a group of persons that share a common immutable characteristic that they either cannot change or should not be required to change because it is "fundamental to their individual identities or consciences."[13]

Mwembie, like the taxi drivers in *Acosta*, can change her employment and thus her status of "government employee." Because she can change her employment, which is not fundamental to her identity or conscience, she does not belong to a "social group" of government employees working at the Marble Palace. In any event, the record shows that she was not imprisoned "because" she belonged in the group of government employees working at the Marble Palace, but "because" she was a criminal suspect.

IV.

We also deny the petition for review on the CAT claim. To secure relief under CAT, an alien does not need to show persecution based on one of the five protected characteristics for claims of asylum and withholding of removal. *Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002). Thus, if Mwembie claims she will be raped in prison or sentenced to death[14] because she was a criminal suspect in Kabila's assassination, she might have a torture claim even if

---

[12] *Ozdemir v. INS*, 46 F.3d 6, 8 (5th Cir. 1994) (finding that police interrogated petitioner because they were seeking information relating to a terrorist incident, not because he was Kurdish or because he wanted discrimination against Kurds to end); *Lwin v. INS*, 144 F.3d 505, 509 (7th Cir.1998); *Dinu v. Ashcroft*, 372 F.3d 1041 (9th Cir.2004); *Shardar v. Ashcroft*, 382 F.3d 318, 323-24 (3d Cir. 2004).

[13] *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 352-53 (5th Cir. 2002) (citing *Matter of Acosta*, 19 I&N Dec. 211, 233, 1985 WL 56042 (BIA 1985) (rejecting claimed social group of Salvadoran taxi cooperative because characteristics that defined taxi drivers are not immutable)).

[14] We do not address the issue of whether a rape or a killing of someone in custody by a government official who was holding the person in custody constitutes torture.

10

she does not have an asylum claim.[15]

Under CAT, the alien must meet the "higher bar" of proving it is more likely than not that he will be tortured if returned to his home country. *Id.*[16] To meet this burden, he may produce evidence of past torture, an inability to relocate to a safer part of the country, human rights abuses committed within the country, and any other relevant information. *See* 8 C.F.R. § 208.16(c)(3).

Mwembie's appellate brief only claims that there is a "reasonable possibility," not that it is "more likely than not," that she would be tor-

tured because she would be viewed as a "government opponent due to the timing and circumstances under which she left her country." A "reasonable possibility" standard is less than a "more likely than not" standard. Mwembie does not further elaborate on the torture issue and does not brief the CAT claim at all or cite legal precedent. Therefore, because she is unable to point out on appeal why it is more likely than not that she will be tortured, she has waived her CAT claim.[17]

The petition for review is DENIED.

---

[15] The viability of a torture claim under this circumstances would depend, however, on whether the "non-political crime" exception applies, because according to her story, Mwembie is a suspect in a murder case, and it may not be prudent for American, rather than Congolese, courts to determine her guilt or innocence, absent proof that she will be found guilty regardless of her actual guilt or innocence. We do not resolve this question, because Mwembie's torture claim fails for a different reason.

[16] The relevant regulation defines torture as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (2000).

[17] *See, e.g., Calderon-Ontiveros v. INS*, 809 F.2d 1050, 1052 (5th Cir. 1986); *see also Mediouni v. INS*, 314 F.3d 24, 28 n.5 (1st Cir. 2002) ("As [the petitioner] did not brief his claim under the Convention Against Torture on appeal, we consider the argument waived.").

11