**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 7, 2006**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

04-60553
_____

ZHONGNE LI,

                                        Petitioner,

                    v.

ALBERTO R GONZALES,
U.S. Attorney General,

                                        Respondent.

_____

On Petition for Review from an Order of
the Board of Immigration Appeals
A96 289 537

_____

Before GARWOOD, BENAVIDES, and OWEN, Circuit Judges.

PER CURIAM:*

    In this petition for review from an order of the Board of

Immigration Appeals ("BIA"), the sole challenge is to the

immigration judge's ("IJ") adverse credibility determination.

After a thorough review of the record, we conclude that the IJ's

_____

    *    Pursuant to 5th Cir. R. 47.5, this Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5th Cir. R.
47.5.4.

1

findings with respect to credibility are contradictory and confusing. We therefore grant the petition and remand for clarification of the findings or for rehearing.

## I. BACKGROUND AND PROCEDURAL HISTORY

Zhongne Li, a citizen of China, was served with a Notice to Appear ("NTA") by the Immigration and Nationalization Service on March 13, 2003.[1] The NTA alleged that Li had illegally entered the United States on or about March 3, 2002. At a hearing before an IJ on March 31, 2003, Li admitted the allegations of the NTA and conceded that he was subject to removal. Li indicated that he would be seeking asylum, withholding of removal, protection under the Convention Against Torture ("CAT") Act,[2] and, in the alternative, voluntary departure.

### A. Li's Testimony and Evidence at the Hearing

The IJ conducted a hearing, and Li was the only witness. Through a translator, Li testified on direct examination that he is a forty-five year old man from China, who is married with one child in college. Li's wife, child, brother, and sister still live in China. Li and his business partner owned a company in China that manufactured products for gold miners. Li owned the business for

---

[1] Although petitioner's identity is in dispute, the parties refer to him as "Li" in their briefs.

[2] Li has not challenged on appeal the IJ's denial of his claim under the CAT. Therefore, any relief under that provision is waived. *Calderon-Ontiveros v. INS*, 809 F.2d 1050, 1052 (5th Cir. 1986).

two years and had fifty-six employees.  His company was seized by the Chinese government in February 2002 and no longer exists.

Li was arrested at a student demonstration in 1989 and spent five days in jail.  In 1996, he became a member of the Shenhe District Underground Family Church ("Church"), a Christian group having about 300 members.  The members were divided into small groups, and Li's group met at his mining company.

In October 2000, police officers came to Li's business and showed Li a picture of one of Li's fellow Church members.  The officers told Li that the man in the picture had been arrested and, while in custody, had told officers that Li was a Christian.  Li denied that he was a Christian and told the police that the man in the picture owed Li's company money and was trying to avoid the debt.  On January 19, 2002, the officers returned to Li's business and searched the office and the factory.  The officers found religious materials and questioned Li and his partner about them.  Li and his business partner were arrested and taken to a detention center.  He never saw his partner again.

Li remained in detention for seventeen days.  During the detention, the police required Li to work and study.  He was denied food and water and was beaten.  If he moved while studying, he would be ordered to kneel for ten hours.  The police interrogated him regarding whether he was a Christian and after being beaten for days, he confessed to disturbing the social order and being harmful to the nations's security.  During the interrogation, he was

3

scalded with hot water on his left hand and shoulder. Because his burns became infected, he was released on bond on February 4, 2002. As he was leaving, a police officer informed Li that he would have to return and "be sentenced to three to five years." After being released, he had to report to the police station on a weekly basis.

Li testified that he was treated for the burns three times at a hospital. He introduced medical records showing that he had received the treatment. Li also introduced photographs of his scars caused by the scalding water and beatings inflicted during his detainment.

According to Li, he applied for a passport in October 2001 after the police visited his business and questioned him about his religious involvement. He obtained a visa on February 19, 2002. He admitted obtaining the passport and visa in the name of his deceased relative, Zhongquan Zhang ("Zhang"). Li could not obtain the passport in his own name because of his arrest record.

Li explained that he obtained Zhang's identification card while Zhang was in the hospital following a traffic accident prior to Zhang's death. Li used Zhang's identification card and his own picture to obtain the passport. He went to the foreign affairs office and filled out some forms and then obtained help from a "street committee."

Li testified that the picture on the identification card was of Zhang, but that he looked similar to Zhang. The IJ skeptically commented, "you want me to believe that, sir?" Li repeated that he

4

looked similar to his relative and that he also had the help of someone in the foreign affairs office to obtain the passport.

The IJ asked Li why he needed someone else's identification card when he had bribed someone in foreign affairs office to obtain a passport. Li explained that "agencies" outside the foreign affairs office told him that they would have someone in foreign affairs help him. The IJ again accused Li of bribing someone in foreign affairs, and Li responded that he could not apply for the passport in his own name.

The IJ asked for Zhang's identification card, and Li answered that it had been taken by the police because Zhang's residency had been cancelled. The IJ asked whether Li had any evidence that Zhang had been killed in an automobile accident, and Li responded that he did not have such evidence because he did not think he would need it once he acquired the visa and passport.

The IJ indicated that Li should have thought to obtain that evidence to prove his asylum claim. Li responded that he thought originally that he would be able to return home to China after one year but then his wife wrote him and told him that he had been sentenced to three years in prison.

The IJ remarked that persons who apply for asylum generally do not expect to return home within one year. Li explained that he planned to return home to run his business until he learned about his prison sentence. The IJ was skeptical that Li actually believed that he could return home to China. Li reiterated that he

5

would have returned if he had not received a prison sentence.

Counsel for the Immigration Service asked Li how he could prove that he was not the person whose name (Zhang) was on the passport. Li responded that he had an identification card, but apparently a card with the wrong name or the wrong translation of the name had been filed in the record. Li's counsel had a different document in his file, but the IJ refused to consider it because it was not previously submitted to the court. However, Li's counsel did produce an identification card that Li testified had his name on it. Counsel also submitted letters addressed to Li by his wife and friend. Li's counsel asked him to identify the translation of his birth certificate, and Li said that he recalled the document, although he did not initially recall that he had submitted that document to the court.

The IJ again questioned Li about how he had obtained a passport. Li again told the IJ that someone outside of the foreign affairs office helped him get the passport using the identification of Zhang and Li's own picture. The IJ asked if fingerprinting was required to obtain a passport, and Li answered no. The IJ did not accept Li's response, questioning how the Chinese government could know that it was issuing the passport to the proper person without fingerprinting. Li repeated that the application was processed without any fingerprinting. Li admitted that it was common in China to be able to purchase a false identification document.

The IJ then asked Li why he should believe Li if it was so

6

simple to obtain a fraudulent document in China. Li acknowledged that corruption was common in the Foreign Affairs office in China. The IJ stated that Li appeared to be making up stories along the way and had not provided the "missing link" evidence, which was the identification card of Zhang or proof of his death. The IJ again attacked Li's credibility, asking why he should believe that Li was who he said he was based on evidence "that easily could have been made up." Counsel for Li responded that the documents provided proved that the applicant was Li. The IJ responded that Li had testified that you could buy any identification documents you want in China, and counsel disagreed that Li had agreed with the IJ's comments concerning bribery. The IJ stated that he had perceived Li's testimony differently. When asked if he would like to see Li's identification card, the IJ refused to look at it because it was not in the record.

Li testified that if he returned to China, he would be persecuted and sent to prison. He related that he would not be safe anywhere in the country because there is a resident management policy that requires reporting to the resident office and local resident agencies.

Counsel for the Immigration Service asked about a photograph of Li's mining company, which reflected that a seal had been placed on the gate of the business. Li stated that the seal was placed on the gate in February of 2002 when the government seized his business. The IJ pointed out that the pictures contained a date

7

stamped by the camera of October 1st or January 10, 2001.[3] Li's counsel replied that many times the dates are not properly set on cameras.

Li learned that his business had been seized from other persons and had not been served with any papers. He testified that it was seized because of the underground church activity. He learned via telephone calls from his friends that his partner had been sentenced to two years in prison.

Li provided a Notarial Certificate of Nationality stating that "Li Zhongen"[4] had been born on October 9, 1959 and was a Chinese national. An English translation of the certificate was also submitted into evidence.

B. <u>IJ's Ruling</u>

After the hearing, the IJ denied Li's applications but granted his request for voluntary departure. The IJ stated that he had observed Li's demeanor during the proceedings and had determined that Li was not a credible witness. The IJ observed that Li had answered his counsel's questions in a forthright manner, but that when he was questioned by the court or the Immigration Service counsel, his "tone of voice changed" and his "hands were holding

---

[3] The date stamp on the bottom of the picture is not clearly discernable in the record on appeal.

[4] According to counsel at the hearing, the actual spelling of Li's name is "Zhongen." However, in the immigration record during the administrative proceedings, it was incorrectly spelled "Zhongne" apparently due to his counsel's error.

8

each other quite tight during that time." The IJ also noted that Li's hands were "trembling" at times. The IJ found that Li's responses were "not meaningful or [were] unresponsive to the questions being asked." The IJ stated that the "answers provide the Court an impression that he was making up explanations along the way, trying to explain away the impossibility or unbelievability that he presented."

The IJ determined that Li gave inconsistent statements about the manner in which he obtained his passport. The IJ also stated that he did not believe that fingerprinting was not required to obtain a passport. The IJ determined that the date on the photograph of the seized business indicated that it was seized in 2001 as opposed to 2002, as Li claimed. The IJ would not consider counsel's suggestion that the camera's date may not have been properly set. The IJ determined that Li had not provided any other evidence that he owned a business. The IJ also was concerned that Li did not recall submitting a birth certificate to the court.

The IJ concluded that he could not determine whether the applicant was Li or the person whose name was on the passport. The IJ also relied on Li's testimony that it is not difficult to obtain false identification documents in China. The IJ concluded that Li had not carried his burden of showing that he was the person he claimed to be. The IJ found that fact, coupled with Li's demeanor and inconsistent statements, rendered him ineligible for asylum or withholding of removal and denied his applications.

However, the IJ went on to state that if the applicant was Li Zhongne, as he claimed to be, the IJ would be required to find that Li suffered past persecution based on his religious activities. The IJ found that Li had joined an underground church in China in 1996 and that twelve members of the group had gathered at Li's business to worship. The IJ found that, as the result of the arrest of one of its members, Li's name was provided to the government as a church member, and Li was arrested and his business was seized. The IJ further determined that during his detention, Li was beaten, given insufficient food, and forced to kneel for ten-hour periods. The IJ determined that this persecution arose out of Li's religious activities. The IJ also found that the background information from the State Department showed that conditions in China had not changed and that there was a nonrebuttable presumption of a well-founded fear of future persecution.

Although he found that Li failed to establish his identity and, thus, a believable account of his alleged persecution, the IJ refused to find that Li testified falsely and granted his request for voluntary departure.

Li timely appealed the IJ's decision to the BIA. The BIA adopted the IJ's credibility determination for the reasons provided by the IJ and affirmed the IJ's decision without opinion. The IJ's decision thus became the final agency determination. See 8 C.F.R. § 1003.1(e)(4). Li now petitions this Court for judicial review of

10

the BIA's affirmance of the IJ's decision.

II. ANALYSIS

Generally, we review only the decisions of the BIA. *Efe v. Ashcroft*, 293 F.3d 899, 903 (5th Cir. 2002). However, when the BIA, as in the instant case, adopts the findings of the IJ, we review the IJ's findings. *Id.*

We review an IJ's factual findings for substantial evidence and will not reverse unless the evidence compels a contrary finding. *See Chun v. INS,* 40 F.3d 76, 78 (5th Cir. 1994). "We cannot substitute our judgment for that of the BIA or IJ with respect to the credibility of the witnesses or ultimate factual findings based on credibility determinations." *Id.* (citation omitted). Nonetheless, we will not uphold "credibility determinations that are unsupported by the record and are based on pure speculation or conjecture." *Mwembie v. Gonzales,* 443 F.3d 405, 410 (5th Cir. 2006).

Li contends that "'the substantial evidence' standard is not the proper one for this case, as this is not one in which the Petitioner is simply arguing that the IJ evaluated the facts improperly." Instead, he argues that the IJ erred as a matter of law in making the adverse credibility determination. We need not reach Li's argument regarding the appropriate standard of review because we conclude that the IJ's findings and conclusions are confusing and contradictory and therefore remand for clarification

11

or for rehearing.

As previously set forth, the IJ concluded that he could not determine Li's identity. The IJ also expressly found Li "statutorily . . . eligible" for voluntary departure. One of the statutory requirements for voluntary departure is that the "alien is, and has been, a person of good moral character for at least five years immediately preceding the alien's application . . . ." 8 U.S.C. § 1229c. We conclude that it is contradictory for the IJ to find that he does not know the identity of the alien but nonetheless finds that such unknown alien is and has been a person of good moral character. *Cf. Kalubi v. Ashcroft,* 364 F.3d 1134, 1141-42 (9th Cir. 2004) (explaining that "if an applicant's testimony on an issue is accepted for purposes of determining whether he is statutorily eligible for asylum, the same testimony must also be accepted for purposes of determining whether he is entitled to asylum as a discretionary matter"). Clearly, without knowing the identity of a person, the IJ cannot determine whether that person is and has been of good moral character for at least five years.

Additionally, the IJ's findings are confusing. The IJ expressly states that he is *not* finding that Li testified falsely. Yet, the IJ makes an adverse credibility determination, finding that Li's account was not "believable." Indeed, the IJ accuses Li of "making up stories along the way [when] I ask you questions.

12

You don't seem to be a credible witness, sir." At least without further explanation, these statements cannot be reconciled. According to the IJ, Li would be entitled to asylum if he in fact was Li. His testimony about his identity cannot be incredible and "made up" and at the same time not be false.

In short, because we find the IJ's findings and conclusions confusing and contradictory, we remand for clarification or, in the alternative, a rehearing. *Cf. Seymour v. Oceanic Navigating Co., Ltd.*, 453 F.2d 1185 (5th Cir. 1972) (remanding to the district court for clarification because the court's findings of fact were "self-contradictory, confusing, and inconsistent with the court's statements at trial"). On remand, the BIA should be mindful of our very recent precedent instructing that (1) adverse credibility determinations should be rational and not based upon pure speculation or conjecture, *Mwembie,* 443 F.3d at 407, (2) adjudicators should be sensitive to potential misunderstandings when an applicant is testifying through a translator, *id.* at 407 n.3 (citing *Iao v. Gonzales*, 400 F.3d 530, 533-34 (7th Cir. 2005)); and (3) adjudicators should be reasonable in demanding further proof or documents to avoid making "'potentially mistaken, culturally based assumptions about the existence and availability of documents.'" *Kabamba v. Gonzales,* 162 F. App'x 337 (5th Cir.

13

2006) (unpublished)[1]  (quoting *Mulanga v. Ashcroft,* 349 F.3d 123, 134 (3d Cir. 2003)).

For the above reasons, the petition for review is GRANTED, and the matter is REMANDED for further proceedings not inconsistent with this opinion.

---

[1]  Although our unpublished opinion is not binding precedent, it is persuasive authority. *Ramchandani v. Gonzales*, 434 F.3d 337, 339 (5th Cir. 2005).