United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 31, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-60851
_____

MONIQUE VULA SHAKENA KOMPANY,

Petitioner,

versus

ALBERTO R. GONZALES, U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A96 274 160

_____

Before JONES, Chief Judge, and JOLLY and STEWART, Circuit Judges.

PER CURIAM:[*]

Monique Vula Shakena Kompany appeals the dismissal by the Board of Immigration Appeals ("BIA") of her appeal of the Immigration Judge's ("IJ") denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Claiming that she was imprisoned and brutally raped for her political opinions and associations, Kompany argues that substantial evidence in the record does not support the IJ's finding that Kompany is not credible. Kompany presents a very sympathetic case. We are not, however, finders of fact. That task

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

belongs to the BIA and to the IJ, which discredited her testimony and rejected her claims. Our sympathy for her story, notwithstanding, we are bound by the rules and the precedents and must DENY the petition.

## I.

Kompany testified to the following: She is a citizen of the Democratic Republic of Congo ("Congo"), a country rife with civil war and military unrest. Her husband, now deceased, was a founding and active member of "Mouvement de Solidarite pour la Democratie et la Protection des Enfants," which, translated, means "Solidarity Movement for Democracy and Child Protection" ("SMDCP"). SMDCP sought to return the majority age from 14 back to 18 by educating the public and voicing their concerns to public officials. SMDCP was founded by a group of lawyers and doctors, that is, by parents whose children had been raped or enrolled by force in the military. SMDCP held meetings once a month, in hiding.

Kompany last saw her husband alive in Congo in 1998 when he dropped her off at work and drove to the hospital where he worked as a physician. On his way to the hospital, he saw a group of people gathered around a twelve-year-old girl lying on the ground, bleeding. Kompany's husband approached the girl, attempting to save her life. A fourteen-year-old military soldier told him to leave because it was none of his business, and the soldier shot and killed Kompany's husband.

2

Kompany eventually obtained the arrest of the fourteen-year-old soldier who murdered her husband. The soldier was in prison only briefly and then disappeared. One day, Kompany returned to her house after Sunday services to find a threat note reading: "YOU ARE DEAD." She fled with her family to her uncle's house and stayed there for a month until she read in the newspaper that the soldier who murdered her husband had been killed while stealing in a house.

Although Kompany's husband was a founding and active member of SMDCP, Kompany did not begin attending SMDCP meetings until 1999, after her husband's death. Although she did not consider herself a member, she was a "sympathizer" and assisted SMDCP by using her work printer and copier to publish documents for SMDCP. Kompany also provided SMDCP with ideas for helping children and women, ideas such as making baskets and preparing salted fish to sell.

On May 12, 2002, Kompany was publishing documents for SMDCP at work when she heard a commotion outside the building. She got up to see what was causing the commotion, when military soldiers entered and ordered her and her colleagues to sit down. The soldiers searched her office and found the SMDCP documents. The soldiers arrested her and two of her colleagues and took them to prison.

At the prison, soldiers beat Kompany with "concentrated plastic," leaving scars on her back. One of the weapons pierced Kompany's right index finger and came out the other side,

permanently injuring it.  The soldiers tied Kompany's hands together with thick string, permanently injuring her wrists.  They also beat her with an electric cord.

The soldiers imprisoned Kompany for a month.  They raped Kompany repeatedly, at least three times per week.  Kompany testified that they each took their turn, and they were different soldiers each time.  According to Kompany's testimony, "[t]he place they took was [sic] all dark, black.  It was a small area, we were numerous.  When they called you to get a coffee, it depended on the day, but maybe one or two performed the act."  In her asylum application, she stated: "After two weeks I was allowed to go outside the cell to cook and clean for the gaurds [sic], who when ever [sic] they wanted would point their gun at you while their friend is violently raping you.  Some of them are younger than my kids but what can you do?  You cry you feel bad you are hurt but before you recover they do it again."

The soldiers fed Kompany and the other prisoners twice each week.  Kompany and the other prisoners took showers once or twice per week.  The prison was "very dirty," causing extensive black blemishes, like pimples, on Kompany's skin: "It, it was starting, my skin was just eating me because of the, the dirt we were, it was the sanitary conditions that caused it, my skin to, to just break out like this and we went to the bathroom, you know, on the floor, on the ground."

4

At one point, soldiers placed a woman who was bleeding severely in Kompany's cell. The woman bled to death. The smell of the corpse became unbearable, and she and other prisoners asked the soldiers to remove the body. It is unclear what precisely occurred at this point, for Kompany testified that the soldiers proceeded to beat her and hit her in the stomach, causing her to bleed excessively. She testified that she "was swelling everywhere because of the beatings." However, she stated in her written statement and asylum application that she was raped violently by two guards, causing her to bleed excessively. Regardless of the cause, she endured the pain for four days, and on the fifth day, she hemorrhaged and lost consciousness. When she regained consciousness, she found herself in Ngaliema Hospital left to die. In Ngaliema Hospital, Kompany was treated by Dr. Nzambi, a friend of her late husband, and found out she was pregnant. Dr. Nzambi feigned Kompany's death and paid off a guard. Soldiers later visited Kompany's house and neighborhood to see if she was really dead.

According to Kompany's testimony before the IJ, she was taken to the hospital on July 13, 2002. She testified that she spent 17 days at the hospital, and that on July 31, Dr. Nzambi gave her a passport and took her to the U.S. Embassy to obtain a tourist visa to the United States. She testified that she stayed at Dr. Nzambi's house and left Congo on August 15, 2002. Two days later, on August 17, Kompany arrived in the United States. In the United

States, Kompany applied for asylum, withholding of removal, and relief under CAT, with the aid of an acquaintance who translated and filled out the application for her.

Before the IJ, Kompany presented her own testimony and the testimony of Lokwekim Matadi, a lawful permanent resident of the United States. Matadi attended school with Kompany's late husband and left Congo in 1989. In 1997, Matadi traveled to Congo and stayed there nine months. During his nine months in Congo, Matadi visited Kompany's late husband's home three or four times. During his visits, Matadi met Kompany, and at the immigration hearing, Matadi identified Kompany as the wife of his late friend, the woman he met while visiting the home of his late friend. He also testified that the couple had two children at the time, confirming an earlier statement by Kompany alleging the same. Furthermore, Matadi testified that Kompany's late husband was involved in an organization to protect and help children. He identified the organization as "Movement for Child Development and Protection." Matadi further testified that Kompany helped promote the agenda of the organization after her husband's death, but apparently this was not based on firsthand knowledge, because he also testified that he had no contact with Kompany after he left Congo in 1997 until he saw her on January 13, 2004 at the hearing before the IJ.

Ultimately, the IJ found Kompany not credible and therefore rejected her claims for relief. In his opinion, the IJ stated: "After observing the respondent's demeanor while testifying, and

comparing her testimony with her written application for asylum, the truth of which she swore to, the Court finds the respondent is not credible." Specifically, the IJ noted numerous inconsistencies in Kompany's testimony, written statement, and asylum application, including: her level of involvement in SMDCP; the identity of the founders of SMDCP; the year of Kompany's arrest; the details of Kompany's arrest; the details of Kompany's stay at Ngaliema Hospital, visit to the U.S. Consulate, and subsequent hiding at Dr. Nzambi's house; and her failure to mention her cousin Gisele Nzazi's death in her written statement and asylum application. The IJ also discredited Kompany's story because she failed to seek treatment for multiple forced sex partners after she arrived in the United States. In this light, the IJ acknowledged Matadi's testimony but found it insufficient to rehabilitate Kompany's testimony. Additionally, the IJ found Kompany's documentary evidence to be of little evidentiary value and therefore insufficient to overcome its adverse credibility determination. Because the IJ found Kompany not credible, he rejected all of her claims for relief.

Kompany appealed the IJ's decision to the BIA and argued, inter alia, that the IJ's adverse credibility determination was clearly erroneous.[1] The BIA affirmed in a one-page order. On

_____

[1] Because Kompany argued the general issue of credibility before the BIA, she has exhausted her administrative remedies. See Wang v. Ashcroft, 260 F.3d 448, 452-53 (5th Cir. 2001) ("An alien fails to exhaust his administrative remedies with respect to an

appeal, Kompany petitions this Court to vacate the BIA's order, arguing that substantial evidence does not support the IJ's finding that she is not credible.

## II.

We have authority to review an order of the BIA and may consider the IJ's underlying decision only if it impacted the BIA's decision. Mikhael v. INS, 115 F.3d 299, 302 (5th Cir. 1997) (citing Chun v. INS, 40 F.3d 76, 78 (5th Cir. 1994)). Here, the BIA dismissed Kompany's appeal of the IJ's decision denying her request for asylum, withholding of removal, and protection under CAT. The BIA concluded that the IJ's adverse credibility determination was not clearly erroneous. Because the BIA essentially adopted the IJ's decision, we must review the IJ's decision. See Mikhael, 115 F.3d at 302.

On a petition for review of a BIA decision, we review questions of law de novo and factual findings for substantial evidence. Lopez-Gomez v. Ashcroft, 263 F.3d 442, 444 (5th Cir. 2001). "Under substantial evidence review, we may not reverse the BIA's factual determinations unless we find not only that the

---

issue when the issue is not raised in the first instance before the BIA-either on direct appeal or in a motion to reopen." (citing Goonsuwan v. Ashcroft, 252 F.3d 383, 388-89 (5th Cir. 2001))). Accordingly, the issue of credibility is properly before this Court. See 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right[.]").

evidence supports a contrary conclusion, but that the evidence compels it." Chun, 40 F.3d at 78. This means "the alien must show that the evidence was so compelling that no reasonable factfinder could conclude against it." Id.

"Credibility determinations are given great deference." Efe v. Ashcroft, 293 F.3d 899, 905 (5th Cir. 2002). "[I]t is the factfinder's duty to make determinations based on the credibility of the witnesses." Chun, 40 F.3d at 78 (citing Vasquez-Mondragon v. INS, 560 F.2d 1225, 1226 (5th Cir. 1977)). "The panel cannot replace the Board or IJ's determinations concerning witness credibility or ultimate factual findings based on credibility determinations with its own determinations." Efe, 293 F.3d at 905 (citing Vasquez-Mondragon, 560 F.2d at 1226); see Chun, 40 F.3d at 78. "As we have previously made emphatically clear, '[w]e will not review decisions turning purely on the immigration judge's assessment of the alien petitioner's credibility.'" Chun, 40 F.3d at 78 (citing Mantell v. INS, 798 F.2d 124, 127 (5th Cir. 1986)). This is not an all-inclusive rule, however, for "we have not read [Chun] to mean that credibility determinations that are unsupported by the record and are based on pure speculation or conjecture will be upheld." Mwembie v. Gonzales, 443 F.3d 405, 410 (5th Cir. 2006).[2] Nevertheless, like other factual determinations, "a

---

[2] Accordingly, in limited instances, we have granted a petition and remanded for a reconsideration of credibility. See, e.g., Zhongne Li v. Gonzales, 184 Fed.Appx. 400 (5th Cir. 2006) (unpublished); Guan v. Ashcroft, 121 Fed.Appx. 563 (5th Cir. 2005)

credibility determination may not be overturned unless the record compels it." Lopez De Jesus v. INS, 312 F.3d 155, 161 (5th Cir. 2002).

III.

The question before us is whether the record "compels" the conclusion that the IJ erred in finding Kompany not credible. See Lopez De Jesus, 312 F.3d at 161. We conclude that it does not. The IJ correctly noted inconsistencies in Kompany's accounts about the year of her arrest and the details surrounding her stay at Ngaliema Hospital, her visit to the U.S. Consulate, and her subsequent hiding at Dr. Nzambi's house. As to the year of her arrest, Kompany stated in her asylum application and written statement that she was arrested on May 12, 2002, and although she ultimately testified that 2002 was the correct year, she initially testified twice, incorrectly, that the year was 1998.[3] Similarly, Kompany testified and indicated in her written statement that she arrived at the hospital on July 13, 2002, whereas her asylum application listed the date as July 31, 2002. As to the other details, Kompany stated in her asylum application that she spent 5 days in the hospital and 2 weeks at Dr. Nzambi's brother's house. In her written statement, she stated that she spent 5 days at the

_____

(unpublished); cf. Mwembie, 443 F.3d at 409-14 (rejecting the IJ's adverse credibility determination but denying the petition on other grounds).

[3] The IJ also stated that Kompany testified that the year was 2000. We find no such testimony in the record.

10

hospital and 6 weeks at Dr. Nzambi's brother's house. At the hearing, she testified that she spent 17 days at the hospital and 5 days at Dr. Nzambi's house. In our view, these inconsistencies seem peripheral to her fundamental claims of torture on grounds of political association, and seem explainable by the trauma she suffered and by translation and other minor errors. Although we believe these inconsistencies may be explainable and are on the outer perimeter of materiality, they nevertheless support the IJ's credibility determination, and the IJ is entitled to rely on them. Thus, we cannot say that "no reasonable factfinder could conclude against [Kompany]." See Chun, 40 F.3d at 78. Nor can we say that the evidence compels a conclusion contrary to the factfinder's, and accordingly, we conclude that there is substantial evidence sufficient to support the IJ's adverse credibility determination. See id.[4]

We do not reach this conclusion lightly. The events described by Kompany, if true, are atrocious. On the record before us, we would likely reach a different conclusion, for we view many of the IJ's findings of inconsistency as readily explainable. For example, while the IJ concluded that Kompany testified

---

[4] The REAL ID Act of 2005 altered the standard of review for credibility determinations. See § 8 U.S.C. § 1158(b)(1)(B). The Act does not apply to Kompany's application, however, because she filed her application prior to May 11, 2005, the effective date of the Act. The Act specifically limits its applicability to applications made on or after its effective date. See REAL ID Act § 101(h)(2), Pub. L. 109-13, 119 Stat. 302, 305; see also Dhima v. Gonzales, 416 F.3d 92, 95 n.3 (1st Cir. 2005).

11

inconsistently about her level of involvement in SMDCP, we read the record to indicate that she consistently described herself not as a "member" but as a "sympathizer" who only attended meetings, published documents, and provided SMDCP with ideas for helping children and women. Furthermore, any misunderstandings about her level of commitment in SMDCP appear to have arisen out of a misunderstanding about whether the pronoun "you" in questions by counsel referred to Kompany alone or to SMDCP as a whole.

Similarly, we see no inherent inconsistency in Kompany's explanation of who founded SMDCP. In her asylum application and written statement, Kompany asserted that SMDCP was founded by parents of children raped or drafted by the military at a young age, whereas she testified that it was founded by lawyers and doctors, including her husband. These assertions by Kompany are not necessarily inconsistent, for some of the lawyers and doctors could have been the parents of children raped or drafted at a young age.

As to the details of Kompany's arrest, it seems to us that Kompany consistently explained in her testimony, written statement, and asylum application that she was at work and heard noises outside; she got up to investigate but soldiers entered the building and commanded her to go back and sit down; and she was taken away by the soldiers after they found the SMDCP documents. To us, the inconsistencies perceived by the IJ were not necessarily inconsistencies but only differences in the number of details that

12

Kompany included in each account. The more important issue to us is that Kompany consistently stated in all three accounts that the soldiers arrested her after they saw the SMDCP documents she had published, thus explaining the reason for her arrest.

Nor do we conclude that Kompany's credibility is diminished by her failure to mention in her asylum application and written statement the death of her cousin Gisele Nzazi and for failing to show that Nzazi died on account of "a ground enumerated within the Act." The record clearly demonstrates that Kompany never argued or alleged that her right to asylum or withholding of removal or relief under CAT was related to Nzazi's death. Instead, she mentioned Nzazi's death only to respond to a specific question by counsel asking whether any of her other relatives had experienced trouble in Congo. Because Nzazi's death seems immaterial to Kompany's claims for relief, we fail to see why her failure to mention his death in her written statement or asylum application affects her credibility.

Finally, we do not understand why the IJ discredited Kompany's story because she failed to seek medical treatment for multiple forced sex partners. It is unclear to us how Kompany, under her particular circumstances, would have known that she should seek such treatment or how she would have obtained such treatment.

Nevertheless, although we might well have reached an opposite conclusion if we were to sit as the factfinder in this case, that role is not ours. See Chun, 40 F.3d at 78 ("it is the factfinder's

13

duty to make determinations based on the credibility of the witnesses"). We are unable to "replace the ... IJ's determinations concerning witness credibility or ultimate factual findings based on credibility determinations with [our] own determinations." <u>See</u> <u>Efe</u>, 293 F.3d at 905. Because the evidence does not <u>compel</u> a contrary conclusion, <u>see</u> <u>Chun</u>, 40 F.3d at 78, we must affirm the IJ's adverse credibility determination. Accordingly, we cannot grant Kompany the relief she seeks.

IV.

For the foregoing reasons, we deny Kompany's petition for review.

PETITION DENIED.