**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-60314
_____

KENNETH EFE,

Petitioner,

versus

JOHN D. ASHCROFT, Attorney General of the United States,

Respondent.

_____

Appeal from the Board of Immigration Appeals

_____

June 20, 2002

Before STEWART and CLEMENT, Circuit Judges.[*]

CLEMENT, Circuit Judge:

Kenneth Efe is a Nigerian citizen who attempted entry into the United States in January 1998. His testimony regarding the circumstances that brought him to the U.S. changed each time he presented his case, including to this Court. The main thrust of Efe's story is that he was involved in a political demonstration in Edo, Nigeria, in which he killed a police officer. Efe ran from

---

[*] Judge Politz was a member of the panel that heard oral arguments. However, due to his death on May 25, 2002, he did not participate in this decision. This case is being decided by a quorum pursuant to 28 U.S.C. § 46(d) (1996).

the police for a number of months before boarding a ship that brought him to the U.S. He was stopped upon entry, beginning the process of immigration hearings that has culminated in this appeal.

For the following reasons, we AFFIRM the Board of Immigration Appeals' denial of all relief and its frivolous application ruling.

## I. FACTS AND PROCEEDINGS

### A. Facts

Efe has testified that in June 1997 he took part in a demonstration in Edo protesting the military government's refusal to install Abiola, who was legally elected to the presidency in 1993. According to Efe, police indiscriminately beat participants in the demonstration, including himself. Efe's story has varied as to just how the beating took place, e.g., what injuries he suffered, whether he was on the ground at any point, how many officers took part or witnessed the event. In one version of the story, he was on the ground while an officer was beating him and he grabbed a glass bottle, with which he hit the officer in the stomach. In the story he has used most often and gave in the first hearing before an immigration judge, Efe escaped to a house along the street where the demonstration was taking place and grabbed a knife. He returned to the street with the knife, fatally stabbed a police officer in the abdomen, and fled. Efe has altered his story as to whether the officer he stabbed was the one who beat him, as well as to whether he saw the officer's intestines fallout

2

or only later learned that the officer died from the wound.  Efe has stated that he had no control over his actions, that the devil took him over; he has also stated that he knew exactly what he was doing.  It is unclear how Efe escaped the demonstration.

Efe claims to have fled to Kastina and then to Lagos, though how long and with whom he stayed in each place are uncertain.  In December 1997, he boarded a ship at Port Island that brought him to the U.S. as a stowaway on or about January 22, 1998.

## B. Proceedings

Efe was stopped coming into the U.S.  The service asylum officer who gave Efe a "credible fear" interview found that he had a credible fear of persecution if returned to Nigeria.  A hearing before the immigration court on the credible fear finding occurred on December 3, 1998.  The immigration judge ("IJ") found that Efe was generally credible regarding his version of the demonstration, stabbing of the officer, and flight.  However, based on dental records and observations of Efe during the hearing, the IJ explicitly questioned Efe's claim that he was thirteen when he arrived in the U.S.  The IJ attributed Efe's vagueness about his age and birth date to attempts to mislead the court.  The court ruled that the police beating Efe suffered constituted severe harm and that the police were probably searching for Efe and would detain, convict, and torture him if he returned to Nigeria.  Nonetheless, the IJ determined that Efe's applications for

3

political asylum and withholding of removal were statutorily barred under Section 208(b)(2)(A)(3)(i) of the Immigration and Nationality Act ("the Act"), because the harm Efe feared was due to a serious nonpolitical crime, specifically, the killing of a police officer. At that time, the IJ did not have authority to grant relief under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment. G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Convention Against Torture" or "CAT").

On August 2, 1999, the Board of Immigration Appeals ("Board" or "BIA") remanded Efe's case to the immigration court for proceedings on the Convention Against Torture claim pursuant to regulations that became effective on March 22, 1999, after Efe's initial hearing. 64 Fed. Reg. 8478 (Feb. 19, 1999); Section 2242(b) of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Division G (Oct. 21, 1998). On January 3, 2000, the immigration court denied withholding of removal under CAT due to the Section 241(b)(iii) bar but granted deferral of removal under CAT. The immigration court adopted the findings of fact and credibility from the first hearing.

The Board again remanded to the immigration court in June 2000, on a motion by the Immigration and Naturalization Service to reopen and remand. The Board ruled that previously unavailable material evidence called into question the credibility of Efe's

4

story.  The new evidence was the result of an investigation by a U.S. Embassy investigator, communicated via a State Department telegram.  The investigator failed to find: information on Efe or his family in state, local, or police records in Owena Village, Benin, Nigeria; a primary school matching the one Efe claimed to have attended; and police records indicating a murder of a police officer in Edo in June 1997.  Further, the former and only chairman of the SDP political party had not heard of Efe or his family, belying Efe's testimony that his father was an officer in the SDP.

A new hearing on the merits was held on August 18, 2000.  On August 30, 2000, the IJ denied Efe's applications for political asylum and withholding of removal under Section 241(b)(3) of the Act and Article 3 of CAT.  The IJ found Efe not credible, stating that Efe had changed his testimony concerning, among others aspects of the case, his name, age,[1] place of birth, schooling, places of residence, family members (e.g., their names,[2] whether he has a

---

[1] Various evidence undermines Efe's credibility concerning age. At the December 1998 hearing, Efe gave 28, 24, 15, and 14 as his age in response to different questions.  Phillip Idemudia of Mesquite, TX, swore that Efe's parents moved to Benin City in 1986 and lived with Idemudia's parents.  He stated that Efe was about ten at that time, which would make Efe over twenty in 1998.  One dental report concluded that there was an 88.6 percent chance that Efe was eighteen or older when he entered the U.S., and another showed that there was a 57.5 to 73 percent chance that he was over eighteen.  The immigration judges also pointed to Efe's demeanor in court and his vagueness and confusion when answering questions regarding age as evidence that he was older than eighteen when he entered.

[2] An affidavit, "Statutory Declaration of Age," purportedly from Efe's father is signed "Mr. Ohwo-Efe Tanga."  At the August 18, 2000, hearing appellant stated that he did not know an Ohwo-Efe Tanga.

brother, whether he has an uncle in the U.S.), the extent and reason for his involvement in the demonstration, whether and, if so, how he stabbed an officer, with whom and where he stayed while fleeing the police, and his knowledge concerning the SDP party.[3]

The IJ ruled that the inconsistencies, contradictions, and improbabilities combined with the lack of corroborating evidence[4] demanded that Efe come forward with more than background material and affidavits. The ruling stated that Efe had neither presented a plausible, coherent account of the basis for a well-founded fear of persecution, nor established that he was a victim of persecution. The IJ added a frivolous application for asylum ruling, finding that Efe had knowingly and intentionally made false statements on his asylum application and during his testimony with the purpose of obtaining asylum. The frivolous application for asylum ruling makes Efe permanently ineligible for benefits under the Act. INA § 208(d)(6).

On March 12, 2001, the Board denied Efe's appeal from the

---

[3]

Efe's accounts of his membership and involvement with the SDP party have fluctuated between tentative to strong declarations. At his credible fear interview he did not know what SDP meant, but he later remembered or gained knowledge of the party and then went back to ignorance. It is unclear if Efe's father was ever a chairman of the SDP party at any level, e.g., of his state, city, or community.

[4]

For example, neither the 1997 Country Report on Human Rights practices in Nigeria, which is amazingly detailed and thorough, nor the relevant Amnesty International human rights report mentions an incident in Benin City in June 1997 that would verify Efe's claims that such an event occurred. The Amnesty report does state that in 1997 the police continued to prohibit public demonstrations commemorating Abiola's 1993 election. Efe has failed to produce any media coverage of the event.

6

denial of all relief and the frivolous application ruling. The Board recognized that the State Department telegram was of limited probative value both in its finding regarding Owena Village and its vague comments about the SDP. Noting that the IJ never mentioned that Efe did not represent that his school was in Owena Village nor that the relevant events occurred there, the Board held that the negative credibility ruling did not rely heavily on the telegram but rather mainly on inconsistencies between the appellant's applications, hearings, statements, and exhibits. Efe has never explained these inconsistencies.

Appeal to this court followed.

## II. ANALYSIS

### A. *Standard of Review*

Efe is an "excludable" alien, technically not considered to have entered the U.S. He is entitled to a reasonably fair opportunity to apply for asylum relief and Convention Against Torture protection. See generally Rodriquez-Fernandez v. Wilkinson, 654 F.2d 1382 (10th Cir. 1981). This court's jurisdiction to review the Board's decision is based on INA § 242(b), 8 U.S.C. § 1252(b) (1998).

We only review decisions made by the Board. Castillo-Rodriquez v. INS, 929 F.2d 181, 183 (5th Cir. 1991). We normally do not consider the rulings and findings of immigration judges unless they impact the Board's decision. Id. Since the Board

7

adopted the IJ's findings and conclusions, we can review the IJ's findings here.

The Board's factual conclusions are reviewed for substantial evidence. Ozdemir v. INS, 46 F.3d 6, 7 (5th Cir. 1994). Questions of law are reviewed de novo. We give great deference to an immigration judge's decisions concerning an alien's credibility. See Chun v. INS, 40 F.3d 76, 78 (5th Cir. 1994) (citing Mantell v. INS, 798 F.2d 124, 127 (5th Cir. 1986)).

An agency's interpretations of the statutes and regulations it administers should be given deference. Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). If the statute is "silent or ambiguous with respect to the specific issue," the court should ask "whether the agency's answer is based on a permissible construction of the statute." INS v. Aquirre-Aquirre, 526 U.S. 415, 424 (1999) (quoting Chevron, 467 U.S. at 843).

*B. Use of Telegram to Reopen*

Efe questions the Board's grant to reopen, which was based on the State Department telegram found in subsequent proceedings to have little probative value. The Board's decision to reopen is reviewed for abuse of discretion. Pritchett v. INS, 993 F.2d 80, 83 (5th Cir. 1993) (citing INS v. Doherty, 502 U.S. 314, 323 (1992)). The Attorney General has broad discretion in granting motions to reopen. See id. "It is our duty to allow [the]

8

decision to be made by the Attorney General's delegate, even a decision that we deem in error, so long as it is not capricious, racially invidious, utterly without foundation in the evidence, or otherwise so aberrational that it is arbitrary rather than the result of any perceptible rational approach." Osuchukwu v. INS, 744 F.2d 1136, 1141-42 (5th Cir. 1984).

No statutory provision covers the reopening of deportation proceedings; such motions have authority only under regulations promulgated by the Attorney General. Doherty, 502 U.S. at 322. The question here concerns 8 C.F.R. § 3.2(c)(1), which reads in part: "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing."

When granting the remand, the Board stated:

"From our review of the newly proffered evidence, we are satisfied that it is material and probative. The evidence directly contradicts the applicant's testimony, calls into question his credibility in crucial aspects of his claim relating to his identity, schooling, and his fear of persecution or torture. We are also satisfied that this evidence was previously unavailable inasmuch as the information regarding an overseas investigation was not transmitted by the Department of State to the Immigration and Naturalization Service until after the conclusion of remanded proceedings."

Later, when reviewing the immigration judge's decision upon remand, the Board recognized that the "telegram is of limited probative value both in its finding regarding Owena village and in its vague

9

comments about the SDP." However, the Board further stated that the "telegram provides that the investigator searched both state and local records, and it appears that Owena Village is within Edo state and perhaps within Benin City, so the Immigration Judge did not err in considering the investigation results." In other words, the telegram potentially contained information directly related to the case and thus was worth considering. The high degree of deference given to the Attorney General in such instances demands that the grant of the motion to reconsider stand.

### C. Asylum

An asylum applicant must demonstrate "persecution or a well-founded fear of persecution on account of [one of five grounds:] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (2000). The main point of contention involves the exception to asylum for serious nonpolitical crimes. If "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States," the Attorney General has the discretion not to grant asylum. 8 U.S.C. § 1158(b)(2)(A)(iii).

The finding of the Board that Efe committed a serious nonpolitical crime that barred him from receiving asylum "is a finding of fact that we review under the substantial evidence test." Zamora-Morel v. INS, 905 F.2d 833, 838 (5th Cir. 1990)

10

(citing <u>Campos-Guardado v. INS</u>, 809 F.2d 285, 290 (5th Cir. 1987));

<u>see also</u> <u>Ozdemir</u>, 46 F.3d at 8.  Under substantial evidence review,

the Board's factual determinations are only reversible if this

court finds that the evidence compels a contrary conclusion.  <u>See</u>

<u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 481 (1992); <u>Silwany-Rodriguez</u>

<u>v. INS</u>, 975 F.2d 1157, 1160 (5th Cir. 1992).  In other words, Efe

must show that the evidence was so compelling that no reasonable

factfinder could conclude against it.  8 U.S.C. § 1252(b)(4)(B).

Further, the Attorney General's determination of political nature

should be given deference.[5]

The Board found not credible the testimony relevant to whether

the police beat Efe because of his political opinions and whether

Efe's crime was nonpolitical, determinations we cannot replace with

our own.  Credibility determinations are given great deference.

The factfinder has the duty to judge the credibility of the

witnesses and to make findings accordingly.  <u>Vasquez-Mondragon v.</u>

<u>INS</u>, 560 F.2d 1225, 1226 (5th Cir. 1977).  The panel cannot replace

the Board or IJ's determinations concerning witness credibility or

ultimate factual findings based on credibility determinations with

its own determinations.  <u>Id.</u>; <u>see also</u> <u>Mantell</u>, 798 F.2d at 127

("We will not review decisions turning purely on the immigration

---

[5] "A decision by the Attorney General to deem certain violent offenses committed in another country as political in nature, and to allow the perpetrators to remain in the United States, may affect our relations with that country or its neighbors.  The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions." <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415, 425 (1999).

judge's assessment of the alien petitioner's credibility.").

The Board was well within its bounds in determining that Efe committed a serious crime of moral turpitude that barred his asylum claim under 8 U.S.C. § 1182(a)(2)(i)(I). Four factors have generally been considered in deciding whether or not a crime is political:

(1) A determination that genuine political motives existed;
(2) Whether the act was directed toward modification of the political organization of the state;
(3) Whether a causal link exists between the crime and political purpose; and
(4) A balance of the political nature of the act with whether it was disproportionate to its objective or of an atrocious or barbarous nature.

See INS v. Aguirre-Aguirre, 526 U.S. 415 (1999); McMullen v. INS, 788 F.2d 591 (9th Cir. 1986).

Efe argues that the killing was political simply by virtue of the fact that it took place during a political demonstration in which officers beat peaceful demonstrators. In light of Efe's lack of credibility--including wavering as to what he knew about the SDP and how he became involved in the demonstration (he has vacillated between happening to be there, joining in with hooligan friends, and participating out of political considerations)--there is no compelling evidence that Efe had genuine political motives in killing the police officer. Even assuming Efe had genuine political motives, which the credibility determination rules out, he would not pass factor (4) since his act of returning to the demonstration to kill a police officer is disproportionate to the

12

objective of installing Abiola.[6]

Efe further pleas that he acted in self-defense and that as a juvenile he did not have the adequate mens rea for a nonpolitical crime. The more likely account of how the stabbing took place has Efe escaping the beating, entering a house, finding a knife, running back out into the demonstration, and killing the police officer. He was no longer under immediate threat of physical harm once he escaped into the house, which rules out his self-defense claim.

As to the lack of mens rea as a juvenile, neither of the IJs involved nor the Board ever believed that Efe was thirteen when he entered the U.S. Finding him to be over eighteen at the time of the incident, they did not have to consider the effects of juvenile status on his claims. Efe also uses his alleged minor status to try and wiggle out of the § 1182 bar via § 1182(a)(2)(A)(ii)(I). However, even if he was a juvenile, § 1182(a)(2)(A)(ii)(I) would not help him. The provision provides that the serious nonpolitical crime exception "shall not apply to an alien who committed only one crime if--(I) the crime was committed when the alien was under 18 years of age, *and* the crime was committed (and the alien released from any confinement to a prison or correctional institution

---

[6] "The criminal element of an offense may outweigh its political aspect even if none of the acts are deemed atrocious, however. For this reason, the BIA need not give express consideration to the atrociousness of the alien's acts in every case before determining that an alien has committed a serious nonpolitical crime." <u>Aguirre-Aguirre</u>, 526 U.S. at 430.

13

imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States." § 1182(a)(2)(A)(ii)(I) (emphasis added). The crime happened well within five years of Efe's application.

Further poor statute reading has Efe claiming that since he was not convicted of killing the officer the moral turpitude bar does not apply. However, § 1182(a)(2)(A)(i) includes both those convicted and those admitting to having committed a crime. There is no dispute that Efe admits to killing a police officer.

*D. Withholding of Removal*

An applicant for withholding of removal must show that "it is more likely than not" that his life or freedom would be threatened by persecution on account of one of the five categories mentioned under asylum: race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.16(b)(1). The substantial evidence standard applies to the Board's factual conclusion that an alien is not eligible for withholding of deportation. <u>Zamora-Morel</u>, 905 F.2d at 838. Withholding of removal is a higher standard than asylum. Since Efe does not meet the bar for asylum, he also does not meet the standard for withholding of deportation.[7]

---

[7] "In addition, whereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion."

14

*E. Convention Against Torture*

The Convention Against Torture claim is separate from the claims for asylum and withholding of removal and should receive separate analytical attention. See <u>Kamalthas v. INS</u>, 251 F.3d 1279, 1284 (9th Cir. 2001); <u>Mansour v. INS</u>, 230 F.3d 902, 908 (7th Cir. 2000). CAT provides in Article 3 that:

> "1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
> 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."

This court has jurisdiction under CAT's implementing legislation, § 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). Pub. L. 105-277, 112 Stat. 2681, 2681-821.

Unlike the asylum and withholding of removal provisions, CAT regulations do not require that the reason for the torture fall within one of the five categories of race, religion, nationality, membership in a particular social group, or political opinion. Another difference is that CAT does not require persecution, but the higher bar of torture.[8] The applicant has the burden of

<u>Aguirre-Aguirre</u>, 526 U.S. at 420.

[8] "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or

15

proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2).

The Seventh and Ninth Circuits have remanded cases for further consideration of CAT claims due to overreliance on an adverse credibility ruling. See Kamalthas, 251 F.3d at 1284 (ruling that "the BIA [had] plainly overrelied on its prior adverse credibility finding against Kamalthas and failed to consider evidence of the relevant country conditions in the record"); Mansour, 230 F.3d at 908 ("the BIA's adverse credibility determination in the asylum context seems to overshadow its analysis of Mansour's torture claim. The BIA in a minimalistic and non-detailed manner addressed Mansour's torture claim; leaving us to ponder whether the BIA sufficiently focused on this claim or merely concluded it was not viable because of its determination that Mansour's prior testimony on the asylum issue was not credible.").

This case is distinguishable from Mansour and Kamalthas in that the latter concerned countries with a general situation of torture among men of a certain ethnic or religious background shared by the alien. Efe does not claim a general atmosphere of

---

suffering is inflicted by or at the instigation of or with the consent or acquiesce of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2000).

16

torture in Nigeria against members of the SDP party,[9] but rather the continued use of torture in Nigerian prisons. Further, the credibility assessment here goes directly to the issue of whether or not Efe will be tortured in Nigeria. The lack of credibility assessment questions whether Efe is likely to be convicted upon returning to Nigeria. In other words, the Board has decided that it is not more likely than not that Efe will go to prison in Nigeria and face a risk of torture.

Efe argues that the immigration court and the Board have not adequately considered whether or not he will be tortured. The Board does not have to "write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Becerra-Jimenez v. INS, 829 F.2d 996, 1000 (10th Cir. 1987). The Board's decisions and adoptions of IJ rulings adequately convey the reasoning behind the denial of the CAT claim and Efe has been given ample opportunity to produce corroborating evidence that would clarify his inexcusably inconsistent testimony. Efe's Convention Against Torture claims fail.

*F. Frivolous Application for Asylum*

---

[9] A recent Fifth Circuit opinion noted that "[t]he IJ [in that case] found further that, even if [the appellant] were credible, substantial improvement of conditions had occurred in Nigeria, his home country, so that [the appellant] had failed to meet his burden of showing that he would be tortured if he were returned there." Balogun v. Ashcroft, 270 F.3d 274, 277 (5th Cir. 2001).

17

We affirm the determination that Efe filed a frivolous application for asylum. Efe has gone back and forth with the facts and misrepresented his case several times. He has also failed to take advantage of ample opportunity to clarify his contradictory testimony.

## III. CONCLUSION

We AFFIRM the denial of asylum, withholding of removal, and protection under the Convention Against Torture. We further AFFIRM the frivolous application ruling.