RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

BINIAM FITWI BERHANE,

        *Petitioner,*

    *v.*

    No. 09-3153

ERIC H. HOLDER, JR., Attorney General,

        *Respondent.*

On Petition for Review from the
Board of Immigration Appeals.
No. A99 668 786.

Argued: March 12, 2010

Decided and Filed: June 4, 2010

Before: KENNEDY, MOORE and SUTTON, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** David Garfield, LAW OFFICE, Washington, D.C., for Petitioner. Theo Nickerson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** David Garfield, LAW OFFICE, Washington, D.C., for Petitioner. Theo Nickerson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    SUTTON, J., delivered the opinion of the court, in which KENNEDY, J., joined. MOORE, J. (pp. 11-15), delivered a separate concurring opinion.

—————————————

## OPINION

—————————————

    SUTTON, Circuit Judge. Biniam Berhane, a native and citizen of Ethiopia, claims that throwing rocks at police during anti-government demonstrations amounts to a political crime, which permits him to seek asylum, as opposed to a "serious nonpolitical crime," which bars him from seeking asylum and withholding of removal. 8 U.S.C.

§§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii).  The Board of Immigration Appeals rejected Berhane's argument, concluding that he had committed  a "serious nonpolitical crime."

At first glance, there are three seemingly good reasons for upholding this decision. The Board's interpretation of the Illegal Immigration Reform and Immigrant Responsibility Act receives *Chevron* deference. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999).  Its fact-based assessments of an applicant's qualifications for asylum receive deferential "substantial evidence" review. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).  And Berhane's rock-throwing was prolific (he participated in 20 such demonstrations) and dangerous (the demonstrators "probably" injured police officers, JA 279).

But the Board's two-page opinion, one paragraph of which bears on this point, raises more questions than it answers.  Although the government acknowledged at oral argument that not all rock throwing amounts to a "serious nonpolitical crime," the Board's fleeting assessment of Berhane's situation offers little explanation for why he falls on the wrong side of the rock-throwing line.  And although the Board's definition of a "serious nonpolitical crime" is well established (whether the criminal nature of the conduct outweighs its political motives), the Board and the courts of appeals have not issued any decisions (to our knowledge) in which rock throwing was the principal criminal act.  For these reasons and those elaborated below, we vacate the Board's decision and remand the matter to the Board for further consideration and further explanation of its position.

I.

Ethiopia held contested parliamentary elections in May 2005.  Before the elections, Berhane and his brother joined a prominent government-opposition group, the Coalition for Unity and Democracy.  Spurred by the Coalition's mission to reduce executive-branch authority and "promote democratization and human rights," JA 201, Berhane taught others about the group and recruited new members to the cause.

The Coalition's political agitation increased after the parliamentary elections. Refusing to accept what they perceived as fraudulent election results, Coalition members participated in a series of street protests.  In response, according to the State Department's country report, police shot and killed protestors from June 6 through June 8.  Between

November 1 and November 7, the report adds, police forces opened fire on demonstrators who were throwing rocks and who may have had machetes and grenades. Berhane joined more than 20 post-election street demonstrations to "fight[] [for] . . . power and democracy and justice . . . [in] Ethiopia," JA 74, 76, though the record does not indicate whether he attended any of the protests mentioned in the country report.

Soon after the election, the Ethiopian government arrested many Coalition members, including Berhane's brother, whom the police arrested in February 2006 and whom his family has not seen since. After his brother's arrest, Berhane fled the country, and soon thereafter the police arrested Berhane's father.

In March 2006, Berhane illegally entered the United States through Mexico. When the Department of Homeland Security caught up with him, it ordered him to appear at a removal proceeding. Conceding removability, Berhane filed for asylum, withholding of removal and protection under the Convention Against Torture. Berhane asked for asylum on the basis of political opinion, claiming that he feared harm if he returned to Ethiopia due to his prior involvement in the Coalition.

During his hearing before an Immigration Judge, Berhane admitted that he threw rocks at police and their vehicles during street protests. He also used rocks to set up barricades on the streets, which kept police vehicles away from the demonstrations. Others protesting alongside Berhane set tires on fire and may have had grenades, though Berhane denied taking part in these more violent activities. When asked whether his rock throwing was the reason the police wanted to arrest him, Berhane agreed that it could be one reason, but he also thought that they wanted him because he "participat[ed] in the neighborhood and recruit[ed] members of [the Coalition]." JA 76.

The Immigration Judge denied Berhane's petition. Although the IJ expressed doubt about Berhane's credibility, he ultimately did not make an adverse credibility finding. "The larger concern," the IJ concluded, was that Berhane had thrown rocks at police, JA 210, which amounted to a "serious nonpolitical crime" and which made Berhane statutorily ineligible for asylum and withholding of removal. *See* 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). The IJ also denied Berhane's claim under the Convention Against Torture.

The Board of Immigration Appeals affirmed, agreeing that Berhane had committed a "serious nonpolitical crime," which barred him from receiving asylum or withholding of removal.  It also rejected Berhane's claim under the Torture Convention.  In his petition for review, Berhane contests only the Board's conclusion that he committed a "serious nonpolitical crime."

II.

Although neither party challenges our authority to consider Berhane's petition, we have an "independent obligation" to ensure jurisdiction before pressing forward.  *Hertz Corp. v. Friend*, 559 U.S. __, 130 S. Ct. 1181, 1193 (2010).  Congress has removed some immigration decisions of the Attorney General from our jurisdiction—generally those "specified under [8 U.S.C. §§ 1151–1381] to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii).  Section 1158(b)(2)(A), the first provision at issue, says that an alien is ineligible for asylum if "the Attorney General *determines* that . . . there are serious reasons for believing that," prior to arriving in the United States, "the alien . . . committed a serious nonpolitical crime."  *Id*. § 1158(b)(2)(A) (emphasis added).  The second provision at issue, § 1231(b)(3)(B), which speaks to the availability of withholding of removal, says that an alien is ineligible for relief if "the Attorney General *decides*" he committed a serious nonpolitical crime (emphasis added).  The question is:  Does the Attorney General's "determin[ation]" or "deci[sion]" that an act is a serious nonpolitical crime amount to an act of "discretion," eliminating our authority to review the decision?

We think not.  The reach of the Act's jurisdiction-stripping provision extends only to those decisions "specified" by statute "to be in the [Attorney General's] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii).  To "specify" that a decision belongs to the Attorney General's discretion requires more than a hint.  "'[S]pecify' means to 'name or state explicitly or in detail.'" *Kucana v. Holder*, 558 U.S. __, 130 S. Ct. 827, 834 n.10 (2010) (quoting Webster's New Collegiate Dictionary 1116 (1974)).  And §§1158(b)(2)(A) and 1231(b)(3)(B) contain no such designation.

The sections, it is true, say that whether an alien committed a serious nonpolitical crime is something the Attorney General "determines," 8 U.S.C. § 1158(b)(2)(A), and "decides," *id*. § 1231(b)(3)(B).  But empowering the Attorney General to "determine[]" (or

for that matter "decide[]") something no more "specif[ies]" "discretion" than empowering the Attorney General to exercise any number of responsibilities under the Act, be they interpretations of the Act, adjudications under the Act, the adoption of rules under the Act or anything else that might count as an administrative "determination" under the Act. No doubt, *the courts* give broad deference to the Attorney General in each of these areas—deference that in turn allows the Attorney General to exercise considerable discretion. *See Aguirre-Aguirre*, 526 U.S. at 424–25. But just because the courts give the Attorney General broad discretion in an area does not mean that *Congress* has "specif[ically]" committed the area to the Attorney General's discretion. Otherwise, our lack of authority to review *some* immigration decisions of the Attorney General would become the unyielding rule. If "'discretion'. . . mean[t] nothing more than the application of facts to principles" or any of these other traditional actions of the Attorney General, it would be difficult to envision "any action by the Attorney General" that would not get caught in the jurisdiction-stripping provision's orbit. *Soltane v. Dep't. of Justice*, 381 F.3d 143, 148 n.3 (3d Cir. 2004) (internal quotations omitted). That is not what Congress had in mind. *See Alaka v. Att'y Gen. of the U.S.*, 456 F.3d 88, 96 (3d Cir. 2006) (the Attorney General's authority to "decide" whether an alien committed a "particularly serious crime," 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1242(b)(3)(B)(ii), is not a discretionary decision over which courts of appeals lack jurisdiction); *Nethagani v. Mukasey*, 532 F.3d 150, 154–55 (2d Cir. 2008) (same).

*Kucana v. Holder*, 130 S. Ct. 827, reinforces this conclusion. In holding that a decision committed to the Attorney General's "discretion" *by regulation* does not satisfy the prerequisite that Congress "specif[y]" *by statute* the Attorney General's "discretion" over an issue, *id.* at 831, *Kucana* admonishes the courts to read the Act's jurisdiction-stripping provisions narrowly—in "accord[] with [the] traditional understanding . . . that executive determinations generally are subject to judicial review." *Id.* at 839. It takes "clear and convincing evidence," *Kucana* says, "to dislodge the presumption" of judicial review over agency actions. *Id.* (internal quotation marks omitted). No such evidence appeared there, and none appears here. Congress committed many issues under the Act to the Attorney General's "discretion," showing that the national legislature understood what it must do to place a decision of the Attorney General out of our reach—and showing just as clearly that

it did not do so here. *See, e.g.*, 8 U.S.C. § 1182(d)(11) ("the Attorney General may, in his discretion" waive inadmissibility of illegal aliens); *id.* § 1186a(c)(4) (a "hardship waiver" based on a "good faith" marriage is "within the Attorney General's discretion"); *id.* § 1227(a)(1)(H) (a waiver of inadmissibility for misrepresentations is within "the discretion of the Attorney General").

One of our unpublished decisions, we acknowledge, held that whether an alien committed a serious nonpolitical crime was a "discretionary determination" over which we lacked jurisdiction. *Celaj v. Ashcroft*, 121 F. App'x 608, 610–11 (6th Cir. 2005). But that case was decided before *Kucana*, to say nothing of being decided through a non-precedential opinion. With the benefit of *Kucana*'s reasoning, we think that giving the Attorney General authority to "determine[]" the serious nonpolitical crime bar's applicability is insufficient to "specify" that the decision belongs to the Attorney General's "discretion."

III.

Did the Board properly conclude that Berhane's activities in Ethiopia—namely, throwing rocks at the police during demonstrations—constitute serious nonpolitical crimes? In trying to answer this question, the parties (and we) share some common ground. A finding that Berhane committed a "serious nonpolitical crime" renders him ineligible for asylum or withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). The Illegal Immigration Reform and Immigrant Responsibility Act delegates to the Attorney General, and ultimately (through the Attorney General) to the Board, authority to determine the meaning of a "serious nonpolitical crime." *See* 8 U.S.C. § 1158(b)(2)(A); *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Aguirre-Aguirre*, 526 U.S. at 424–25. The Board has permissibly interpreted this language to mean that a crime is "serious" and "nonpolitical" when "the criminal nature" of the act "outweigh[s] its political nature." *Aguirre-Aguirre*, 526 U.S. at 431; *see In re McMullen*, 19 I. & N. Dec. 90, 97–98 (BIA 1984). As applied to Berhane, this inquiry raises factual questions about the nature of his conduct and legal questions about the appropriate circumstances to consider in the balance. The former questions receive "substantial evidence" review, requiring us to uphold the agency's finding unless "the evidence not only *supports* [a contrary] conclusion, but indeed *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1. The latter questions receive

*Chevron* review, requiring us to uphold the Board's determination as long as it represents a permissible reading of the statutory bar for "serious nonpolitical crimes." *See Aguirre-Aguirre*, 526 U.S. at 424–25.

As gauged by these considerations, the question is whether the Board permissibly determined that "the criminal nature" of Berhane's actions "outweigh[ed]" their "political" components. On one side of the scales, there were ample bases for finding that his actions were "criminal." Berhane's testimony confirms as much. His actions were violent: He recalled "hit[ting] the police" with rocks and "disappear[ing] from [the] area" when he saw that they were in "bad condition." JA 91. They were destructive: In addition to taking aim at the police, Berhane "sometimes" threw rocks "to crash some cars," which he qualified only by saying that he targeted government vehicles. JA 92. And they were frequent: He threw rocks during 20 demonstrations, and he ultimately threw rocks at the police "countless" times. JA 89. Taken together, these facts support the agency's finding that Berhane's acts were criminal in nature.

On the other side of the scales, the record establishes a political motive for Berhane's actions. "The main purpose of throwing the rocks," Berhane explained, "was . . . to give a lesson to the policemen that [he was] for democracy and for equality of Ethiopian people." JA 89–90. And the protestors, Berhane says, used force "to show that [the protestors were] supporting the [Coalition's] principles" and "to oppose" the government. JA 90.

Matters grow more complicated when we consider the Board's explanation for determining that the criminal aspects of Berhane's actions "outweighed" the political motives for engaging in them. Here is what the Board said:

> In reaching his determination that the respondent was barred from asylum and withholding of removal, the Immigration Judge stated that in view of the scope of the respondent's activities, the political aspects were outweighed by the criminal law aspects. Contrary to the respondent's appellate contentions, the Immigration Judge's findings of fact have not been shown to be clearly erroneous. Further, we find the Immigration Judge properly applied the approach taken by the Board in *Matter of McMullen* in determining that the political aspects were outweighed by the criminal law aspects. We are not persuaded to disturb the Immigration Judge's decision.

JA 279 (citations omitted). In a footnote to this paragraph, the Board quoted (with apparent approval) this aspect of the Immigration Judge's decision:

> The Immigration Judge would understand if respondent took part in a peaceful demonstration or took part in a demonstration calling to international attention the actions of the Ethiopian government in its possible intimidation of voters and electoral leaders. Instead, respondent testified that he took part in at least 20 demonstrations in which rocks were thrown, tires burned, and boulders placed in such a way that the police would be impeded in their activities. By throwing these rocks, the demonstrators damaged or destroyed public and private property and probably injured police officers as well.

*Id.* at n.2.

The Board's brief analysis is susceptible of at least two readings. One is that rock throwing during political demonstrations invariably will amount to a "serious nonpolitical crime." A portion of the Immigration Judge's decision quoted by the Board seems to embrace this interpretation, as the IJ distinguishes between permissible "peaceful demonstration[s]" and impermissible "demonstrations in which rocks were thrown." The other possibility is that rock throwing by itself is not what sinks Berhane's application. It is the number of demonstrations in which he threw rocks (20), combined with other activities (burning tires and placing boulders in the streets) and the consequences of all of Berhane's activities at the demonstrations (damage to public and private property and the fact that police officers "probably" were "injured").

At oral argument, we asked the Attorney General's representative whether the first interpretation was the correct one—whether the Board treated all rock throwing at anti-government demonstrations as a "serious nonpolitical crime." Counsel responded, quite reasonably, that, in weighing the criminal and political nature of an applicant's actions at a demonstration, the Board makes case-by-case findings and does not believe that all rock throwing amounts to an asylum-barring crime. It is tempting to accept counsel's assurances, to invoke the Board's broad discretion in deciding who has committed a "serious nonpolitical crime," *see Aguirre-Aguirre*, 526 U.S. at 424, and to leave it at that. But several competing considerations suggest that the better course is to ask the Board to clarify its decision.

To our knowledge, this is the first Board or Court of Appeals decision to deal with a conventional, if nonetheless violent, form of street protest—rock throwing—one that the State Department reports, to say nothing of the nightly news, indicate happens with some regularity in other countries. The Board's original decision in this area in 1984, *In re McMullen*, 19 I. & N. Dec. at 92–93, 95, dealt with far more serious criminal acts—terrorist bombing directed at civilian and government targets—which not only implicate the bar for "serious nonpolitical crimes," but also implicate the anti-persecution bar, 8 U.S.C. § 1101(a)(42); *McMullen*, 19 I. & N. Dec. at 95. Other more recent decisions are at least one step removed from this one in terms of criminality and risks to public safety. In *Chay-Velasquez v. Ashcroft*, the criminal acts of burning buses, breaking windows and fighting with the police outweighed the political motive of protesting "important political and social issues." 367 F.3d 751, 754–55 (8th Cir. 2004). In *Efe v. Ashcroft*, the criminal act of killing a police officer at a rally outweighed the alien's political motive, even where the police were allegedly violent toward the protestors. 293 F.3d 899, 905–06 (5th Cir. 2002). And in *Aguirre-Aguirre*, the criminal acts of burning buses, assaulting passengers and vandalizing property outweighed the political motive of protesting the Guatemalan government. 526 U.S. at 418, *petition denied on remand at* 191 F.3d 998, 998 (9th Cir. 1999). That Berhane's acts were comparatively less violent than these other crimes does not innoculate him from the serious-nonpolitical-crime bar, but it does suggest that the Board ought to explain why he falls on the wrong side of the line—if indeed he does. And that is particularly true given the prevalence of rock throwing as a form of street protest.

Neither the Board nor the Immigration Judge, moreover, addressed one of Berhane's principal arguments: that his rock throwing was an act of self defense and was never directed at civilians. At one point in his testimony, Berhane explained that he would throw rocks only "if the police [were] violent and if they start[ed] hitting [Coalition] members." JA 89. A theory of self defense, it is true, does not show that his actions were political. But it might diminish the criminal nature of the actions, which weighs in the balance. The Board must address the point in the first instance.

It is not lost on us that the Board deserves considerable deference in deciding what amounts to a "serious nonpolitical crime." The Board, not the judiciary, is best suited to engage in the difficult weighing of an applicant's political motives against the criminal

nature of his actions. And the decision to characterize certain crimes "committed in another country as political in nature," and to therefore "allow the perpetrators to remain in the United States," is an "especially sensitive" determination that could affect diplomatic relations with that country. *Aguirre-Aguirre*, 526 U.S. at 425 (internal quotation marks omitted). But the Board's discretion, even broad discretion, to make these assessments still requires it to provide a reasoned explanation for barring some asylum seekers and not others. Deference requires upholding a Board decision even when it is not the choice we would have made so long as there is a reasonable path for reaching it. It does not require upholding a Board decision without regard to whether there is a reasoned basis for it, and it does not require us to envision a rational explanation ourselves. Board decisions are upheld when the agency has exercised reasoned discretion, not as a matter of grace, and the Board must offer sufficient reasons for allowing us to distinguish between the two.

IV.

For these reasons, we vacate the Board's decision and remand the case for further review.

———————————

**CONCURRENCE**

———————————

KAREN NELSON MOORE, Circuit Judge, concurring. I agree with the majority's resolution of the jurisdictional issue and its observation that not all rock-throwing constitutes a "serious nonpolitical crime" barring asylum and withholding of removal under 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). I write separately, however, because I believe this case compels us to do more than remand for clarification of the Board of Immigration Appeals's ("BIA") reasoning. Specifically, I would grant the petition on the basis that the immigration judge ("IJ") committed legal error in failing to consider the full context of Berhane's rock-throwing and that the IJ's ultimate finding was not based on substantial evidence.

The serious-nonpolitical-crime provision of the Immigration and Nationality Act ("INA") renders an applicant ineligible for asylum and withholding of removal when "the political aspect of an offense outweighs its common-law character." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 429 (1999). In this case, the BIA affirmed the IJ's determination "that the political aspects [of Berhane's crime] were outweighed by the criminal law aspects," citing a single paragraph from the IJ's opinion. J.A. at 279.

The majority explains that the BIA's opinion can be read in two ways: (1) as holding that any rock-throwing during political demonstrations is a serious nonpolitical crime, or (2) as holding that the combination of throwing rocks at twenty demonstrations, burning tires and placing boulders in the street, and damaging property and harming officers makes Berhane's conduct a serious nonpolitical crime. The majority returns the case to the BIA because the former rationale would not be a proper basis for denying asylum. I agree, but I would reach an issue that the majority does not decide. For several reasons, I believe that even if the BIA intended to rely on the second rationale, its order would not support application of the statutory bar.

First, it should weigh heavily in the balance that much of Berhane's rock-throwing can be attributed to self-defense. Berhane testified that he threw rocks at officers when the police advanced toward the crowd and when they struck protestors, and generally not

otherwise. J.A. at 76, 89. As the majority states, the self-defense motivation "diminish[es] the criminal nature of his actions." Maj. Op. at 10. Insofar as the BIA found no error in the IJ's weighing of the criminal and political aspects of Berhane's acts, crediting Berhane's self-defense claim suggests a different outcome. The BIA's failure to consider the impact of Berhane's self-defense claim on the criminal-political balancing constitutes legal error.

Second, Berhane's crime is not egregious. Berhane did not himself burn tires, and there is no evidence that anyone around him possessed grenades.[1] On the facts of this case, the setting of large rocks in the street was so nonviolent and defensive an act that its criminal aspects cannot outweigh its political aspects. And any damage to civilian cars was unintentional. Even on the second rationale discussed by the majority, then, this case boils down to throwing rocks at police officers and police cars during political demonstrations.[2] Cars were damaged, but the IJ, quoted by the BIA, found only that police "probably" were "injured." J.A. at 212, 279. The frequency of the rock-throwing, meanwhile, cannot be dispositive, as at each protest Berhane's conduct had political aspects.

Moreover, as the majority observes, Berhane's conduct is far less serious than that involved in reported cases in which the courts have approved serious-nonpolitical-

---

[1] A New York Times article indicated that the Ethiopian government "accus[ed]" protestors of hurling grenades, J.A. at 131, and a State Department report stated that some protestors "were armed with . . . grenades," J.A. at 178, but there is no evidence that this happened at the protests that Berhane attended. During the IJ hearing, government counsel noted that one news article indicated that grenades were thrown at protests and then asked Berhane, "Did you or anyone in your group have grenades?" Berhane replied simply, "Me, I didn't have any." J.A. at 75–76. It would be a leap to infer that others protesting with him *did* have grenades. Certainly, the IJ made no such finding.

[2] On these facts, we confront a case more complicated than others we have seen in this area of immigration law. To date, we have reviewed serious-nonpolitical-crime determinations in only two cases. In one of those cases, the crime in question had no political valence at all and thus required no balancing of political versus criminal aspects. *Urbina-Mejia v. Holder*, 597 F.3d 360, 363, 369 (6th Cir. 2010) (former gang member had robbed civilians, sometimes striking them with a baseball bat). In the other, the crime in question had no real criminal valence and likewise required no balancing. *Perkovic v. INS*, 33 F.3d 615, 616, 622 (6th Cir. 1994) (Yugoslavian man of ethnic Albanian descent did not commit a serious nonpolitical crime when he manufactured Albanian national flags and posters, posted them in public places, removed Yugoslav signs and flags, and organized civil-rights study groups). The instant case is the first that involves a "relative" political crime, one that has both criminal and political aspects. *See McMullen v. INS*, 788 F.2d 591, 596 (9th Cir. 1986). In vacating and remanding, we make clear that protestors need not be peaceful to escape the serious-nonpolitical-crime bar. In my view, this message is consistent with our duty to avoid signaling—in this case or in future ones—that mixed conduct of very low criminal character is sufficient to constitute a serious nonpolitical crime. It would be an overly harsh reading of the INA to imply that solely petitioners who have committed pure political crimes or who have caused only minor property damage will avoid the statutory bar.

crime determinations. In *Aguirre-Aguirre*, a former member of a rebellious student group set fire to passenger buses, stoned and tied up bus passengers, and vandalized private shops. *Aguirre-Aguirre*, 526 U.S. at 421–22. In *Chay-Velasquez v. Ashcroft*, 367 F.3d 751 (8th Cir. 2004), the petitioner was a member of a student group that broke windows on government buildings, marched and fought with police, and burned civilian buses. *Id.* at 753. Significantly, the petitioner himself in that case made bottle bombs to throw at the police. *Id.* In *McMullen v. INS*, 788 F.2d 591 (9th Cir. 1986), the petitioner took part in bombings, trained fellow paramilitants, and organized illegal arms shipments while part of the Provisional Irish Republican Army. *Id.* at 593. In *Efe v. Ashcroft*, 293 F.3d 899 (5th Cir. 2002), the petitioner left a political demonstration, retrieved a knife from his home, returned to the demonstration, and murdered a police officer there. *Id.* at 906. And in *Guo Qi Wang v. Holder*, 583 F.3d 86 (2d Cir. 2009), the petitioner extracted organs and tissue from executed prisoners in China and once removed the skin from a person who was still alive. *Id.* at 88–89, 91.

In several of these cases, the court was moved by the applicant's choice of civilian targets for his violence, *see Aguirre-Aguirre*, 526 U.S. at 423; *Chay-Velasquez*, 367 F.3d at 754–55; *McMullen*, 788 F.2d at 595–98—an element missing from the instant case. While we must be cautious about drawing a sharp legal line according to which relief turns on the identity of the targets of crime, the BIA should have considered that factor as part of a totality-of-the-circumstances inquiry, just as the Supreme Court did in *Aguirre-Aguirre*.

Third, the BIA gave the political context of the rock-throwing short shrift. Berhane was an active member of a reform political party committed to the democratization of Ethiopia, a country in which political prisoners numbered in the thousands. J.A. at 183 (State Dep't Report 2005). In May 2005, the country had its first actively contested parliamentary elections. Though polling was "generally credible," "irregularities and intimidation of voters and election observers marred polling in many areas." J.A. at 177 (State Dep't Report). The Carter Center, an election-monitoring NGO, reported:

> In places we have found evidence that ballot boxes have been moved improperly, were improperly secured, or that party agents were barred from polling stations or were not allowed to watch the entire count. Our observers have received, and in some cases have been able to confirm, reports of election day and postelection intimidation and harassment. In some cases our observers report that [National Election Board ("NEB")] personnel have been slow to mobilize in investigating charges of electoral problems. In addition, in some of the areas visited in the postelection period, observers have experienced difficulty accessing information from local NEB officials.

J.A. at 150 (Carter Center 6/3/05 Report). Once the ruling party announced the results, the Coalition had taken "far fewer [seats] than [it] believed it was due." J.A. at 131 (N.Y. Times 5/14/05). The government then quickly changed the parliament's procedural rules to block the Coalition's ability even to raise an issue for discussion in that body. *Id.* With good cause to believe the election results had been tampered with, Berhane and thousands of other Coalition members engaged in a classic form of dissent: they took to the streets. The prime minister quickly banned all protests for a month and later extended the ban. J.A. at 156–57. "[A]uthorities arbitrarily detained, beat, and killed opposition members, ethnic minorities, NGO workers, and members of the press" and "imposed additional restrictions on civil liberties, including freedom of the press and freedom of assembly." J.A. at 177 (State Dep't Report). A European Union observer mission expressed "[s]erious concern over the threats and intimidations of opposition parties, including isolated cases of murder." J.A. at 154 (BBC HardBall Interview with Prime Minister Meles Zenawi).

Nonetheless, the Coalition protestors continued to rally. They faced military and police forces who to them represented the repressive regime that had just committed widespread electoral fraud. That regime had also closed off alternative, legitimate avenues for dissent by cracking down on the press, banning even peaceful demonstrations, and arresting and murdering opposition leaders. And it had reacted to protests with "excessive and indiscriminate use of force," shooting into crowds and killing over forty protestors in one demonstration. J.A. 158 (BBC, citing Amnesty International), 178 (State Dep't Report). In that context, is it truly a disproportionate act

for a Coalition protestor *to throw rocks* at police officers, some of whom had shields? J.A. at 89.[3]

In sum, Berhane's rock-throwing was not egregious, may not even have been criminal at times, and was thoroughly political. At the very least, the BIA's failure to consider fully the context of Berhane's acts constitutes legal error. Had the BIA looked at the full picture, moreover, I believe that the evidence would have compelled it to conclude that a pro-democracy activist who throws rocks at political demonstrations in self-defense and to protest election fraud by a regime that had silenced the press, banned free assembly, rounded up the opposition, and killed unarmed civilians did not commit a "serious nonpolitical crime." For these reasons, I would go further than the majority, which elects only to remand for clarification at this point. I would grant the petition for review.

---

[3] Berhane aptly cites recent events in Iran. Although Iran is a different country, the events there make the merit of Berhane's argument more palpable. In the summer of 2009, Iranian President Mahmoud Ahmadinejad defeated reform candidate Mir Hossein Mousavi in an election widely condemned for fraud. Protestors took to the streets, and the protests continued intermittently over the next several months. In December 2009, tens of thousands of students participated in huge demonstrations, and many of them threw rocks at Iranian security forces. Those forces opened fire, killing several people. The White House condemned Iran's "'unjust suppression' of civilians." Reuters, Five Die in Tehran Pro-Reform Protests, Dec. 27, 2009, http://www.reuters.com/article/idUSLDE5BQ06J20091227. President Obama himself then condemned the "iron fist of brutality" used against the protestors and called for the release of detained protestors. CNN, Obama, Merkel Condemn Crackdown on Iranian Protests, Dec. 28, 2009, http://www.cnn.com/2009/WORLD/meast/12/28/iran.protest.reaction (internal quotation marks omitted). Congress had in the past issued resolutions supporting the protestors and condemning the Iranian regime's crackdown after similar events. *See* S. Res. 193 (June 19, 2009); H. Res. 560 (June 18, 2009). These events suggest to me that pro-democracy youths who throw rocks at a repressive regime's security forces are not the type of criminals Congress intends to keep out through its statutory bar for serious nonpolitical crimes.