# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 9, 2020

Lyle W. Cayce
Clerk

No. 18-60236

MARISELA INESTROZA-ANTONELLI,

Petitioner

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before KING, JONES, and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Marisela Inestroza-Antonelli, a native Honduran citizen, filed a motion to reopen her removal proceedings on the basis of changed country conditions in Honduras. She relied in part on the alleged dismantling of institutional protections for women against gender-based violence following a 2009 military coup. Without addressing the coup, the BIA found that any change in gender-based violence was incremental or incidental and not material. Because this conclusion is not supported by the record, we grant the petition and remand.

**I.**

In 2005, Inestroza-Antonelli failed to appear for an immigration hearing, and the Immigration Judge (IJ) ordered her removed in absentia as an alien

No. 18-60236

present in the United States without having been admitted or paroled. Inestroza-Antonelli was detained by Immigration and Customs Enforcement in March 2007 and released under an order of supervision. She was granted stays of removal until June 23, 2017, when her application for a stay was denied.

On July 26, 2017, Inestroza-Antonelli filed a motion to reopen her removal proceedings. She argued that the normal time limit for filing a motion to reopen should be excused because she could show changed country conditions in Honduras since the time of her original hearing—specifically, a 263.4 percent increase in violence against women since 2005. She submitted a number of documents in support of her motion, including expert declarations, news articles, and reports demonstrating the elimination of systemic protections for women against gender-based violence following a 2009 military coup in Honduras. Specifically, Inestroza-Antonelli introduced evidence of the following changes in Honduras since the coup: (1) the Gender Unit of the Honduran National Police, established between 2004 and 2005, has been restricted in its operations, and access to the Unit is now limited or nonexistent; (2) the power of the Municipal Offices for Women to address domestic violence has been severely diluted, and officials have been removed from their positions for responding to women's needs, especially those related to domestic violence; (3) institutional actors have targeted women for violence, including sexual violence, and threatened the legal status of over 5,000 nongovernmental women's, feminist, and human rights organizations that have opposed the post-coup government's policies; (4) the rate of homicides of women more than doubled in the year after the coup and has continued to steadily increase, ultimately becoming the second highest cause of death for women of reproductive age; and (5) in 2014, the status of the National Institute for Women was downgraded and other resources for female victims of violence

No. 18-60236

were eliminated as part of a government restructuring.  The IJ nonetheless issued a written decision denying Inestroza-Antonelli's motion to reopen, finding that violence against women had been an ongoing problem in Honduras since before 2005 and the increase did not represent a change in country conditions.

On appeal to the Board of Immigration Appeals (BIA), Inestroza-Antonelli argued that the IJ abused its discretion because she had shown a significant increase in her risk of harm due to the changes brought about following the 2009 coup.  Without making any mention of the coup, the BIA concluded that the IJ had not clearly erred because  the evidence reflected only an "incremental or incidental," rather than material, change in country conditions.  Inestroza-Antonelli filed a timely petition for review.

## II.

This court reviews the final decision of the BIA and considers the IJ's opinion where, as here, it affected the BIA's decision.  *Nunez v. Sessions*, 882 F.3d 499, 505 (5th Cir. 2018).  This court reviews the denial of a motion to reopen under an abuse of discretion standard.  *Id.*  However, we review the legal conclusions underlying that decision *de novo* and the factual findings for substantial evidence, reversing when the record compels a different finding. *Fuentes-Pena v. Barr*, 917 F.3d 827, 829 (5th Cir. 2019).

## III.

Inestroza-Antonelli filed her motion to reopen well after the ninety-day time limit typically applicable under 8 U.S.C. § 1229a(c)(7)(C)(i).  However, a petitioner may file a motion to reopen at any time for the purpose of applying for asylum, withholding of removal, or protection under the Convention Against Torture so long as the motion is based on evidence of a substantial change in country conditions that was not previously available and could not have been presented at the prior hearing.  *Nunez*, 882 F.3d at 508 (citing 8

No. 18-60236

U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.23(b)(4)(i)).  To take advantage of the exception, the petitioner must show a material rather than incremental change in country conditions between the time of the removal hearing and the filing of the motion to reopen.  *Id.* at 508-09.  Showing the continuation of a trend or a change in personal circumstances is insufficient.  *Id.*

The BIA dismissed Inestroza-Antonelli's appeal because it found that her "evidence describes conditions in Honduras substantially similar to those that existed at the time of [her] 2005 hearing, and at best, reflects only an 'incremental or incidental' change."  This misstates the record.  Inestroza-Antonelli introduced voluminous and uncontroverted evidence that the regime established after the 2009 coup made changes that substantially reduced legal protections for women and dramatically impaired institutions within the government and civil society that protect women from gender-based violence.  And the coup was accompanied by the rate of homicides of women *doubling* within a single year, which can hardly be described as incremental.

The Government introduced no conflicting evidence, nor any evidence of country conditions in Honduras at all.  Instead, the Government on appeal cherry-picks excerpts from the evidence that Inestroza-Antonelli introduced, including the 2014 Department of State report describing the availability of domestic violence shelters and municipal women's offices.  However, the report itself concludes that "[t]he government provided insufficient financial and other resources to enable these facilities to operate effectively."  Similarly, a 2014 article by the United Nations News Centre that the Government refers to makes reference to "attempts" by the Honduran government to address violence against women, but it also indicates that "the lack of effective implementation of legislation, gender discrimination in the justice system, inconsistencies in the interpretation and implementation of legislation, [] the lack of access to services that promote safety and help prevent future acts of

4

violence[, and t]he lack of accountability for acts of violence against women and girls" remain significant problems in post-coup Honduras.

Likewise, the dissent selectively cites various passages from Inestroza-Antonelli's evidence that it argues provide a foundation for the BIA's decision. But in context, the record does not bear out this reading of the evidence. For example, the dissent postulates that, because overall violence in Honduras increased during the period at issue and one of Inestroza-Antonelli's expert declarations attributes some of the increase in violence against women to a "generalized breakdown of law," a significant portion of the increase in violence *might* not be gender-based, but instead attributable to a proliferation of small arms and the prevalence of organized crime. Dissent at 3-4. But this mere speculation is all the more doubtful in light of Inestroza-Antonelli's evidence that, following the spike in violence against women, the United Nations reportedly classified Honduras as having more women murdered *because of their gender* than anywhere else in the world. The dissent also makes much of the fact that the rate of violent deaths of women marginally dropped in 2015 as compared to 2013 (though it was still much greater than in 2005). But, contrary to the dissent's contention, the evidence indicates that the rate increased as compared to 2014, suggesting the beginning of another upward trend. And the dissent states that "it would have been plausible to suppose that a substantial decrease in violent deaths of women had occurred between 2015 and late 2017, as order continued to be restored." Dissent at 4. But our standard of review of a BIA decision is not whether there theoretically could have been some unevidenced occurrence that would make its findings correct. It is whether its factual findings are based on substantial evidence. *Singh v. Gonzales,* 436 F.3d 484, 487 (5th Cir. 2006). Here, where there is no evidence to rebut the inference that the rates of violence against women in 2016 and 2017 were similar to those in the immediately preceding years for which data

was available, there is no substantial evidence to support a hypothetical sudden—and drastic—decrease to near 2005 levels. The record thus compels the conclusion that conditions have significantly changed in Honduras since 2005.

Despite the dissent's implication, our decision does not conflict with this court's precedent. In *Nunez v. Sessions*, 882 F.3d 499 (5th Cir. 2018), the petitioner sought to reopen her removal proceedings based on changed country conditions in Honduras between 2005, when she was ordered removed, and 2014. *Id.* at 504. This court indicated that it might consider "a significant increase in violence against women" as a "change in country conditions justifying waiver of the deadline for reopening." *Id.* at 510. However, the petitioner had failed to introduce any evidence before the IJ of "country conditions as they existed in 2005, when she was ordered removed." *Id.* at 509. The IJ took administrative notice of a 2005 State Department report to conclude that violence against women was a problem in Honduras in 2005, and we therefore held that because there was "some evidentiary foundation for concluding that the increase in violence [was] incremental but not a material change," the BIA had not abused its discretion. *Id.* at 509-10. We emphasized that our decision was based "[o]n the record before us." *Id.* at 510. We have also rejected similar arguments in unpublished cases, based on the evidence presented therein. *See Escobar-Umanzor v. Sessions*, 720 F. App'x 722, 723 (5th Cir. 2018); *Escalante-Alvarez v. Lynch*, 654 F. App'x 167, 168 (5th Cir. 2016).

Here, however, Inestroza-Antonelli introduced a great deal of evidence concerning conditions as they existed at the time of her removal hearing and how they significantly differed from current conditions. Specifically, her evidence indicates that in 2005 the Honduran government had implemented policies to address gender-based violence, but after the coup, these policies

were dismantled, resulting in a dramatic increase in the number of violent deaths of women as compared to the rates that existed in 2005. Thus, unlike in this court's previous cases, there is no basis in the record for concluding that the increase represented only an incremental change that did not amount to a significant shift in country conditions from those that existed at the time of Inestroza-Antonelli's removal hearing. And to hold that Inestroza-Antonelli is precluded from proving that conditions changed as a factual matter during this period simply because a previous petitioner failed to do so would violate the "basic premise of preclusion"—i.e., "that parties to a prior action are bound and nonparties are not bound." 18A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4449 (3d ed. 2019).

The BIA did not even mention the 2009 coup in its opinion finding that Inestroza-Antonelli had failed to establish changed country conditions. And, other than a conclusory statement that it had "considered [Inestroza-Antonelli's] arguments," there is no indication that the BIA meaningfully evaluated her evidence of institutional changes following the coup. "While the BIA need not "write an exegesis on every contention," as the dissent points out, it must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Efe v. Ashcroft*, 293 F.3d 899, 908 (5th Cir. 2002) (quoting *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987)). The BIA's complete failure to address uncontroverted evidence of a clearly significant turning point in the country's history and the central role that it played in Inestroza-Antonelli's arguments regarding changes in country conditions does not meet this standard, and it was thus an abuse of its

No. 18-60236

discretion.[1] *Cf. Rivera-Gomez v. Holder*, 584 F. App'x 729, 730 (9th Cir. 2014) (unpublished) (holding in a similar case that the BIA's complete failure to address "the highly significant 2009 military coup" was an abuse of discretion). We therefore grant Inestroza-Antonelli's petition.

\*\*\*

Based on the foregoing, we GRANT the petition and REMAND for proceedings consistent with this opinion.

---

[1] The BIA also rejected Inestroza-Antonelli's argument that the presence of her abusive husband in Honduras following his 2009 deportation represented a change in country conditions, finding that it was instead a shift in personal circumstances. Inestroza-Antonelli argues that this was error because the change was not self-induced. Although several of our sister circuits have concluded otherwise, *see, e.g.*, *Joseph v. Holder*, 579 F.3d 827, 834 (7th Cir. 2009); *Larngar v. Holder*, 562 F.3d 71, 76-78 (1st Cir. 2009); *Malty v. Ashcroft*, 381 F.3d 942, 944 (9th Cir. 2004), this court has indicated that a change may be personal even if it is not self-induced. *See, e.g.*, *Singh v. Lynch*, 840 F.3d 220, 222-23 (5th Cir. 2016) (holding that threats and violence to the petitioner's mother and the targeting of petitioner by the Indian police constituted only changes in personal circumstances); *Ramos-Lopez v. Lynch*, 823 F.3d 1024, 1026 (5th Cir. 2016) (determining that the involvement of petitioner's brother-in-law in a drug cartel in Guatemala was a change in personal circumstances). We therefore cannot say that the BIA abused its discretion in this respect.

No. 18-60236

EDITH H. JONES, Circuit Judge, dissenting:

I respectfully dissent from the order of remand to the BIA. "[A] petitioner bears a heavy burden to show changed country conditions for purposes of reopening removal proceedings." *Nunez v. Sessions,* 882 F.3d 499, 508 (5th Cir. 2018). *Nunez* held just the opposite of the panel here: that the BIA did *not* abuse its discretion in concluding that Honduran country conditions had not changed so substantially, during the exact time period covered in this case, to require reopening an undocumented woman's decade-old removal case. Two other recent decisions of this court, also considering country conditions in Honduras, are consistent with *Nunez.* *See Escobar-Umanzor v. Sessions,* 720 F. App'x 722, 723 (5th Cir. 2018) (citing *Nunez*); *Escalante-Alvarez v. Lynch,* 654 F. App'x 167, 168 (5th Cir. 2016). The panel majority here claims to rely on additional evidence, not present in these cases, to support its contrary conclusion.

The majority has failed to defer to the BIA, which, hearing no doubt hundreds (or thousands) of cases from Honduras, must be far more familiar with country conditions than judges working from our isolated perch. As will be seen, the majority has carefully selected evidence favorable to the petitioner, ignoring facts from the record that support the BIA's conclusion. On remand, I submit, the BIA will deny reopening as it has already done. We do violence to the structure of immigration law when we incorrectly permit cases to be reopened, particularly when the system is being overrun. As the government points out, motions to reopen are particularly disfavored where "every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *INS v. Doherty,* 502 U.S. 314, 323 (1992).

In her petition to the BIA, Inestroza-Antonelli argued that "gender-based violence, including domestic violence, and the failure of state protection for women who are victims of such violence, have significantly and dramatically

9

worsened in Honduras since 2005, thereby materially . . . increasing her risk of harm from her abuser." In response, the BIA, after "consider[ing] all [Inestroza-Antonelli's] arguments" found that "the evidence describes conditions in Honduras substantially similar to those that existed at the time of [her] 2005 hearing, and at best, reflects only an 'incremental or incidental' change." To support this point, the BIA cited two cases as analogous. As against Inestroza-Antonelli's first argument the court cited *Singh v. Lynch*, 840 F.3d 220, 222 (5th Cir. 2016), noting that no material change in country conditions exists if there is presently "continuance of ongoing violence in the home country." As against the petitioner's second argument, the BIA cited *Matter of S-Y-G*, 24 I&N Dec. 247, 257 (BIA 2007), noting that an "incremental or incidental change" in a country's policies does not constitute a material change.

"In reviewing the denial of a motion to reopen removal proceedings, we apply a highly deferential abuse-of-discretion standard. "'[S]o long as [the Board's decision] is not capricious, racially invidious, *utterly without foundation in the evidence*, or otherwise *so irrational that it is arbitrary rather than the result of any perceptible rational approach*,' we must affirm the Board's decision. We review the BIA's factual findings under the substantial-evidence standard, which means that we cannot reverse the BIA's factual determinations unless the evidence '*compels* a contrary conclusion.'" *Nunez*, 882 F.3d at 505 (alteration in original) (emphases added) (citations omitted).

The BIA's decision is far from lacking any foundation. Instead, the evidence is substantial, at least, that conditions in Honduras—specifically, the level of *gender-based* violence and the failure of state protection against such violence—were no more than incrementally or incidentally worse in late 2017 (when the IJ refused to reopen this case) than in early 2005 (when the

No. 18-60236

deportation order was issued). Further, all the evidence recited here is based on the petitioner's own submissions.

Consider, first, the level of gender-based violence. According to one expert cited by Inestroza-Antonelli, "violence against women has been ongoing far longer than the violent incidents characterized by gang or drug-related battles or wars." According to another, Honduras has had a "culture of violence against women" at least since 1992. Thus, well before 2005, and certainly before 2009, "women faced substantial risks to their physical safety and security throughout Honduras." In 2004 and 2005 in particular, Inestroza-Antonelli's evidence indicates that gender-based violence such as to warrant establishment of a special Gender Unit, which nevertheless faced opposition from "shortly after it came into existence." This evidence constitutes at least some foundation for the conclusion that gender-based violence was significant in 2005.

Similarly, the BIA had at least some foundation to determine that gender-based violence was no more than incrementally worse in 2017. True, the evidence indicates that "violent deaths of women in Honduras . . . increased 263.4 percent between 2005 and 2013" (although one source provided by Inestroza-Antonelli laments a lack of "accurate, reliable and uncontested data"). That tragic fact, however, speaks hardly at all to an increase in gender-*based* violence.[1] The record supports that the number of violent deaths of all

---

[1] The majority claims that, "following the spike in violence against women, the United Nations reportedly classified Honduras as having more women murdered *because of their gender* than anywhere else in the world." *Ante*, at 5. The report in question, though, does not clearly attribute its definition of "femicide"— "the murder of a woman because of her gender"—to the United Nations. Moreover, elsewhere in the record, an article reports that "the Small Arms Survey [is] often cited by United Nations officials and women's rights advocates." This Survey explicitly defines "femicide" as "any killing of a woman," and distinguishes that concept from "gender-based killing." The Small Arms Survey, *Femicide: A Global Problem*, 14 Research Notes 1, 1 (2012),

persons in Honduras more than doubled, at least between 2004 and 2009, and that in 2014 Honduras maintained the highest general murder rate in the world. In that same year, the violent-death rate of women was one-fifth the general violent-death rate and thus lower still than the violent-death rate for men. Meanwhile, small arms proliferated and organized crime increased. Accordingly, as the IJ and BIA suggested, the additional killings were likely not based on gender, but rather either a collateral effect of increased violence or based on a general desire to gain and exercise power. Consistently with this theory, Inestroza-Antonelli's own expert attributes the increase in violence in this period in part to a "generalized breakdown in the rule of law." Although the record could support finding *some* increase in gender-based violence between 2005 and 2013, it does not compel that conclusion.

That is more than it compels regarding 2017, the year of actual relevance to the BIA. The most recent evidence in the record indicates that, in 2014 and 2015,[2] the number of violent deaths of women dropped, compared with 2013. For the years following, there are no data at all. Given the record evidence of a 218 percent change when order was disrupted in 2009, however, it would have been plausible to suppose that a substantial decrease in violent deaths of women had occurred between 2015 and late 2017, as order continued to be restored. In any event, because the data establishing *gender-based* violence in 2013, not to mention in 2017, are insufficient—or at very least plausibly so—

---

http://www.smallarmssurvey.org/fileadmin/docs/H-Research_Notes/SAS-Research-Note-14.pdf. The Small Arms Survey cited in the record gave the BIA reason to doubt that the United Nations had provided numbers of gender-based killings, rather than numbers of (violent) killings of women. Conflation of these two concepts is rife throughout the record, including in the very article cited by the majority.

[2] According to Inestroza-Antonelli's evidence, there were somewhere between 513 and 531 violent deaths of women in 2014, and in 2015 roughly 300 such deaths had occurred as of November 17.

the BIA could plausibly find that the increase in gender-based violence between 2005 and late 2017 was incremental.

As a second argument that a material change in country conditions occurred between 2005 and 2017, Inestroza-Antonelli contended, for the first time on appeal to the BIA, that "the failure of state protection for women who are victims of [gender-based] violence" has "significantly and dramatically" increased. Substantial evidence, however, supports the BIA's rejecting this contention. For example, Inestroza-Antonelli's evidence indicates that "the need to institutionalize the Municipal Offices for Women (OMM)" was present at least as early as 2004, and that by 2014, "many town or city governments ha[d] created OMMs in response to women's demands and the political will of the Mayors." Similarly, Inestroza-Antonelli's expert declaration states that the Honduran Law against Domestic Violence was toothless and ineffective in 2005, but that post-2005 amendments to this law brought about some positive changes (as of 2012). Furthermore, according to Inestroza-Antonelli's evidence, the National Congress added the crime of femicide to the penal code for the first time in 2013. The following year, the record evidence suggests, the rate of violence against women dropped. In this light, the factual finding that legal protections for women were no more than incrementally worse is not "utterly without foundation in the evidence."

Not only that, the contrary evidence cited by the majority opinion is flawed. To start, the opinion's statements about the Gender Unit, outrun the evidence. Granted, the record indicates that the National Police Force's Gender Unit was ineffective in 2013. The record says nothing, however, about the status of the Gender Unit in 2017, four years after the first law banning femicide went into effect. Nor indeed does the record clearly establish that the Gender Unit was effective in 2005. To the contrary, it suggests that curtailing the effectiveness of the Gender Unit began right away. Why the 2005 Gender

Unit is not just another "attempt" to address violence against women, as meaningless to the majority as the later "attempts" cited in the government's brief, the majority does not say.

The majority opinion also cites a report which indicates that, in 2010, as part of a general reform of municipal government, the Honduran government required Municipal Offices for Women "to attend to a wide variety of problems," including or focusing on problems relating to "the reproductive role of women and the mother-child relationship." The expansion or refocus of a particular set of political offices' responsibilities hardly compels the conclusion that the formal subject of their previous responsibilities has suffered a material decrease in legal protection.

Next, the majority opinion relies on evidence that "institutional actors have targeted women for violence, including sexual violence." It fails to note that the evidence situates these occurrences in 2009, before what Inestroza-Antonelli's evidence characterizes as "a period of stabilization." There is no evidence to support that, in 2017, governmental actors were still targeting women for violence.

The majority opinion asserts that country conditions have materially changed because the Honduran government allegedly threatened the legal status of 5,000 non-governmental organizations. The document cited is unclear about when these alleged threats occurred, although they could not have occurred any later than July 2014. The document clearly explains, however, that these threats resulted from the organizations' "openly stat[ing] their repudiation of the coup d'etat and all resulting government policies." A change in the government's approach to NGO's that was caused by their repudiations of governmental legitimacy—even if the repudiation was justified and the response unjustified—is incidental, or at least plausibly so, to the condition of women as women in Honduras.

All told, the BIA's factual finding of no material change in the failure of state protection against gender-based violence is not utterly without foundation in the evidence, and indeed, the evidence on which the majority opinion relies is flawed.  Accordingly, this finding, like the finding regarding the actual rate of gender-based violence, was not an abuse of discretion for lack of substantial evidence.  The majority opinion, however, raises one further ground on which to find that the BIA abused its discretion.

According to the majority, the BIA failed "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ante*, at 8 (quoting *Efe v. Ashcroft*, 293 F.3d 899, 908 (5th Cir. 2002)).  This is a remarkable claim, given that the BIA accurately stated both parts of Inestroza-Antonelli's Honduran conditions issue and then cited both the Immigration Judge's findings and one authority for each argument in rejecting both arguments on this issue.  These statements substantiate, and render more than conclusory, the BIA's declaration that it has "considered the respondent's arguments on appeal."

Nevertheless, the majority faults the BIA for not giving sufficient indication that it had considered evidence that the majority finds "uncontroverted," about an event that the majority finds "clearly significant" (the 2009 coup) and that the majority deems "central" to Inestroza-Antonelli's arguments "regarding changes in country conditions."  For this novel principle, the majority cites an unpublished, out-of-circuit decision, relating to gang violence, and decided six years closer than this decision to the "clearly significant" event in question.  This argument from authority falls far short of compelling.

The substantive argument fares no better.  The "clearly significant event" was the 2009 coup.  The BIA's not mentioning that event was

reasonable, however, as was the extent to which the BIA addressed the institutional changes following it.

Starting with the coup, Inestroza-Antonelli did not argue before the BIA that the 2009 crisis constituted, in itself, a material change to country conditions.  Instead, she argued that an alleged increase in gender-based violence and an alleged decrease in legal protections against such violence constituted material changes in country conditions.  Moreover, Inestroza-Antonelli's evidence indicates that, as of 2014, Honduras had, "[i]n recent years," "been undergoing a period of stabilization."  Already in 2010, it had set up a "Truth Commission to examine events surrounding the 2009 coup."  Then, "[i]n November 2013 Juan Orlando Hernandez of the National Party won the presidential election for a four-year term that began in January [2014]. International observers generally recognized the election as transparent, credible, and reflecting the will of the electorate."  By the time the IJ and BIA reviewed Inestroza-Antonelli's case, her evidence indicated that the country had for several years been "a constitutional, multi-party republic," albeit one facing many problems.  In light of this evidence, there is a "perceptible rational approach" by which the BIA deemed the 2009 crisis itself not directly relevant and not worthy of mention.

As for the evidence of institutional changes following the coup, the BIA indicated that it had considered such evidence when it cited *Matter of S-Y-G,* citing a different page than was cited by the IJ to establish a new proposition, namely that that "incremental or incidental" changes in a country's *policies* do not constitute changed country conditions.  Apparently, the majority would require another sentence, specifying that the weakness of the police force's Gender Unit in 2013 and other structural changes in two other institutions constitute only incremental or incidental changes.  We lack good reason to put

16

the BIA through this wasteful exercise, but compliance on remand should be simple enough.

More troubling is this decision's disregard of the proper standard of review. There is substantial evidence on the record to support the BIA's order. The panel majority's contrary reasoning is highly selective and seriously flawed. The standard is "whether the BIA's conclusion, in adopting the immigration judge's determinations, is 'utterly without foundation in the evidence.'" *Nunez,* 882 F.3d at 510 (quoting *Singh v. Gonzales,* 436 F.3d 484, 487 (5th Cir. 2006)). *Nunez* added, "Reasonable minds may disagree over whether an increase in violence of a certain degree over a certain number of years counts as a material change in the condition of a country. Reasonable disagreement, however, is not our standard." *Id.* I respectfully dissent.